**James Lawrence RONEY, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 68873.

Court of Criminal Appeals of Texas,
En Banc.

May 5, 1982.

Rehearing Denied June 2, 1982.

Donald W. Rogers, Jr., Houston (court appointed on appeal), for appellant.

John B. Holmes, Jr., Dist. Atty. and Winston E. Cochran, Jr. and Ned Morris, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ODOM, Judge.

This is an appeal from a conviction for capital murder in the course of robbery.

V.T.C.A., Penal Code Sec. 19.03(a)(2). The jury having returned affirmative answers to the issues submitted at the punishment stage under Art. 37.071(b), V.A.C.C.P., punishment is death.

In his first ground of error appellant contends it was error to allow a police witness to bolster the identification testimony of Man Thi Tran, the surviving robbery victim present at the murder. He relies on *Lyons v. State*, 388 S.W.2d 950. The State argues the bolstering testimony was admissible because appellant attempted to impeach the identification by Man. In *Smith v. State*, 520 S.W.2d 383, the Court applied the rule relied on by the State:

"In the instant case, after Rouchell had identified appellant at trial, appellant's lengthy cross-examination elicited testimony from Rouchell that he had never seen appellant before the day of the shooting, that he did not know what appellant was wearing on the day in question, that he remembered the man who shot him was 'five foot seven or eleven,' and that he did not know whether the man who shot him had a 'mustache or a goatee or any kind of facial hair on the 25th of November' or whether he was well shaven. In light of appellant having 'impeached or attempted to impeach' Rouchell regarding his identification of appellant, we find no error in the court admitting the testimony of officers Huffman and Crowder that Rouchell identified appellant at the scene of the wreck. . . ."

The rule is:

"Where the defendant impeaches or *attempts to impeach* the testimony of the identifying witness, the testimony of a third party as to the witness' extrajudicial identification is admissible. *Turner v. State*, 486 S.W.2d 797; *Frison v. State*, 473 S.W.2d 479; *Beasley v. State*, 428 S.W.2d 317." *Franklin v. State*, 606 S.W.2d 818, 824 (reversed on other grounds on rehearing).

The record in this case shows the following attempt to impeach Man on cross-examination, which is similar in several respects to the cross-examination summarized in *Smith v. State*, supra:

"Q. Now, I want you to describe for me the man with the gun, as you describe the man to the police. Was he tall or short?

"A. Shorter than her.

"Q. Shorter than you. Did you tell the police he was less than five feet tall?

"A. She—she said that she couldn't tell exactly, you know, how many feet, but she know that he shorter than her.

"Q. Was his skin light or dark?

"A. Light.

"Q. What color was his hair?

"A. White/yellow.

"Q. Did you tell the police he had short brown hair?

"A. No, ma'am.

"Q. Is this your signature?

"A. Yes, ma'am.

"Q. Is this the statement you gave to the police?

"A. Yes, ma'am.

"Q. Do you remember what the man with the gun was wearing?

THE INTERPRETER: The gun?

"A. (T through the Interpreter) She can't remember what he wear but she knew that he wore a coat outside.

"Q. (By Mrs. Garcia) Did you tell the police he was wearing a vest?

"A. (T through the Interpreter) The style, you know, like a vest, but not a vest; a coat.

"Q. Was it a coat or was it a vest?

"MR. MORRIS: Your Honor, we would object to repetition and arguing with the witness.

"THE COURT: Sustained.

"Q. (By Mrs. Garcia) What kind of pants was he wearing?

"A. (T through the Interpreter) She—she can't remember that.

"Q. Did he have a scar on his face?

"A. No, ma'am. She think that he has no scar on the face.

"Q. Was his hair short or was his hair bushy?

"A. His hair—his hair is short, just like her. And she said just like her like this (interpreter indicating), and shine; hold his head.

(Witness indicates.)

"THE INTERPRETER: You know, I don't know what she meant.

"Q. (By Mrs. Garcia) Did you mean the hair is close to his head?

"THE INTERPRETER: Yes.

"Q. (By Mrs. Garcia) Or do you say his hair was as long as yours?

"A. (T through the Interpreter) She said just about her hair and so—not fluffy. Not fluffy.

"Q. Did his hair cover his ears?

"A. No, ma'am.

"Q. Did you see his pants?

"A. No, ma'am.

"Q. Did the counter hide his pants?

"A. She maybe equal with his pants, but she didn't pay attention to his pants."

■ We hold the record shows an attempt to impeach Man's identification that was of a sufficient degree to authorize admission of the bolstering testimony. The first ground of error is overruled.

■ In his next ground of error appellant asserts it was error to deny court-appointed counsel ten days to prepare for trial as required by Art. 26.04, V.A.C.C.P. The record reflects that appellant was represented by three attorneys, two of whom were appointed long in excess of the ten day statutory period for trial preparation. Appointment of an additional attorney within less than ten days of trial did not violate Art. 26.04, supra. *Henry v. State,* 433 S.W.2d 430, 432–433. The ground of error is without merit.

In his fifth ground of error appellant challenges the sufficiency of the evidence to support the jury's affirmative answer to the second punishment issue. Art. 37.071(b)(2), V.A.C.C.P. He contends the evidence is insufficient to prove beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."

In his argument appellant points to the absence of evidence of a prior criminal record and the failure of the State to present psychiatric evidence and character evidence. He also asserts there was an absence of physical violence in the one extraneous offense shown by the State (an aggravated robbery committed only minutes before the murder). In addition, appellant relies on evidence he presented at the punishment stage of the trial that he was seventeen years old, had an eighth grade education, had no prior arrests, and voluntarily surrendered himself to police.

The State, in reply, relies on three factors as supportive of the jury's affirmative finding on the future dangerousness issue: the gravity of the offense, appellant's attitude, and the extraneous offense.

■ Evidence presented at the guilt stage of the trial may be considered by the jury when determining the second punishment issue, and the circumstances of the offense, if severe enough, may alone be sufficient to support an affirmative answer by the jury on that issue. *Muniz v. State,* 573 S.W.2d 792; *Brooks v. State,* 599 S.W.2d 312. Prior criminal conduct, a criminal record, the age of the defendant, and psychiatric evidence are among the various other matters relevant in deciding the second punishment issue. See *Earvin v. State,* 582 S.W.2d 794; *Brooks v. State,* 599 S.W.2d 312; *Barefoot v. State,* 596 S.W.2d 875.

We first summarize the evidence of the offense. On October 22, 1979, Nguyen Viet Hoang and Man Thi Tran [1] were working at a U-totem store in Houston when Trevor Haughton entered. Haughton (who testified as an accomplice witness) was in the store for about three minutes and then was gone for about five minutes before re-

---

1. In the record Man Thi Tran is referred to by the name "Man" and Nyuyen Viet Hoang is referred to by the name "Hoang."

turning with appellant and Jesse Andrews.[2] Haughton entered first, followed by Andrews, both of whom were unarmed, and then appellant, who was armed with a sawed-off shotgun. Man was behind the counter and Hoang either was in the restroom or just coming out of the restroom. Appellant first pointed the shotgun at Man, and then, as Hoang was moved into the area behind the counter, the gun was pointed at him. The two victims were searched for money, but apparently had none. Money was taken from the cash register, then Hoang was ordered to open the safe but was unable to do so. He appeared to be shocked and scared. Haughton went out of the store to check for cars, and then ran to the car that the three robbers had come in because he was scared. Andrews also ran to the car and both were already in the car when the shotgun blast was heard. Appellant then ran to the car and they drove from the scene. According to Man, the only eyewitness to the shooting to testify, Hoang had his hands raised when he was shot. The doctor who performed the autopsy testified the gun was about three feet from the victim when fired.

Several witnesses testified to statements made by the appellant shortly after the offense. After fleeing the scene the trio drove to a friend's house, where they spent that night and the next day. During the time they were there several witnesses heard appellant make statements about the murder. One who heard him the night of the offense testified appellant said:

"A. 'I had to kill the m_____ f_____ before I let him kill me.' ·

"Q. Did he say anything else?

"A. He just going on, talking to hisself about something; I don't know."

Another witness testified that on the afternoon of the next day appellant suggested everyone watch the television news, and when the robbery story came on he laughed. Appellant also showed this witness a newspaper story on the robbery and said, "I had to kill that son of a gun, 'cause he was going to kill me," and that he would not get caught because "it was two blacks and one white" while the news reported it was "two whites and one black."

A third witness who could not give a specific date testified that in late October appellant told her that he "had to kill a Vietnamese" and "That the Vietnamese came at him with the broom—with a gun and that he had to kill him." This witness also testified that appellant told her, "that if some police came to Regina's [the friend's] house, they better have their insurance policy paid up or he would kill them with the same gun that he killed the Vietnamese with."

Jamil Daaboul testified to appellant's participation in an extraneous offense. At about 10:15 p.m. on October 22, a short time before the primary offense, Daaboul was working at a Mr. M Foodstore when two black males came in to buy some beer. When asked for identification, one of them said his was in the car and both left the store. Then one of them returned with appellant, who was carrying a sawed-off shotgun. He pumped the gun, stuck it in Daaboul's face, and said, "This is my I.D. Give me the money, or I shoot you." About $54 was taken, but they were not able to get into the safe.

A police officer testified that after appellant became a suspect in the case, he contacted appellant's mother on November 10, and appellant surrendered himself to the police department three days later. Appellant's mother testified that after the police came to her house, she made arrangements with their family minister for appellant to surrender himself to the police.

**2.** There is a conflict between the versions told by Man and by Haughton. Man testified the robbery was committed by two white men and a black man, while the three participants named by Haughton were two black men and a white man. Also, according to Man two of the robbers were in the store briefly and left before the three came in together and committed the offense, while Haughton testified that he alone went in and left before returning with Andrews and appellant to commit the robbery. These discrepancies are not relevant to the issue at hand, but concern only the role and identity of the third man, supposedly Andrews, who remained unapprehended at the time of trial.

Appellant's mother also testified that appellant went to the eighth grade in school and was working after he left school, that he was seventeen years old, that he had never been convicted of a felony or of a misdemeanor involving moral turpitude, and that he had never been arrested or charged with anything else.

■ Although this was a senseless murder, that fact is true of every murder in the course of a robbery. The facts of this offense, standing alone, do not carry the marks of a "calculated and cold-blooded crime," such as appeared in *O'Bryan v. State*, 591 S.W.2d 464, 480, where the defendant for months planned the candy poisoning of his own child to collect life insurance. To support a "yes" answer to the second punishment issue, the evidence must show beyond a reasonable doubt that there is a probability appellant would commit criminal acts of violence that would constitute a *continuing* threat to society. To hold that the facts of *this* offense, standing alone, would support such a verdict, would mean that virtually every murder in the course of a robbery would warrant the death penalty. Such a construction would destroy the purpose of the punishment stage in capital murder cases, which is to provide a reasonable and controlled decision on whether the death penalty should be imposed, and to guard against its capricious and arbitrary imposition. *Jurek v. State*, 522 S.W.2d 934; *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929.

When we consider appellant's attitude about the offense, as reflected in the statements made to others (the second factor relied on by the State), we see no significant contribution toward discharge of the State's burden. While it is true he called the attention of others to what he had done, and at one point laughed, he also repeatedly claimed he "had to" kill to defend himself, and muttered to himself about the offense. The various statements taken as a whole reflect an agitated and somewhat distressed individual, more than a boastful person, as argued by the State.

The final factor relied on by the State is the extraneous robbery of Daaboul. Although the robbery was not characterized by "an absence of physical violence" as argued by appellant, it is also true this robbery was committed only minutes before the primary offense. The two robberies were essentially parts of a one-night crime spree. It does not show a repetition of criminal conduct so much as a single criminal purpose with two successive targets. It does not exhibit the kind of repeated criminal conduct shown in *Brooks v. State*, 599 S.W.2d 312, 323, and *Russell v. State*, 598 S.W.2d 238, 254, relied on by the State, where various prior convictions clearly demonstrated a probability of a *continuing* threat to society.

■ When the weak factors relied on by the State are viewed in conjunction with the other factors relied on by appellant: his young age, his lack of a prior record or arrests, the absence of psychiatric or character evidence, and his surrender three days after his mother was contacted by police, we must conclude in light of the record as a whole that the State has not shown beyond a reasonable doubt the probability that appellant will commit criminal acts of violence that will constitute a continuing threat to society. See *Wallace v. State*, 618 S.W.2d 67; *Brasfield v. State*, 600 S.W.2d 288, 293. Consequently, punishment must be reformed to life imprisonment. *Wallace v. State*, supra, at 69.

The other grounds of error relate only to punishment and are therefore moot. *Sanne v. State*, 609 S.W.2d 762.

The judgment, with punishment reformed to life, is affirmed.

ONION, P. J., and W. C. DAVIS and McCORMICK, JJ., dissent.

CLINTON, Judge, concurring.

With respect to the first ground of error, if appellant's questions and her answers, made more difficult since the complainant was testifying through an interpreter, are to be regarded as an attempt to impeach her identification such that bolstering testimony then becomes admissible, then the

rule of *Lyons v. State*, 388 S.W.2d 950 (Tex. Cr.App.1965) has lost its vitality. As I view the crossexamination quoted in the majority opinion, certainly there was nothing close to impeachment.[1] It is, as in *Lyons*, supra, "True, she was fully cross-examined by appellant with reference to her identification, but she was not impeached." Realistically considered, the crossexamination is so desultory and pointless and the responses so adequately affirmative that it may not be fairly characterized as an "attempt" at impeachment. But if the quoted testimony, almost conversationally given, is enough to admit bolstering by third persons, then the lesson being taught by the Court is that an appellant goes into the matter of identification with an eyewitness at his peril.

However, in light of all evidence including that of the accomplice witness, the issue could not have loomed large in the collective mind of the jury.

Accordingly, I concur in the remainder of the opinion of the Court and its judgment.

ROBERTS and TOM G. DAVIS, JJ., join.

---

1. In order of descriptive features of the armed robber inquired about, the witness estimated height, stated color of skin, disclaimed reporting short brown hair (but is not shown to have erred), named kind of outer garment (that obviously lost something in the translation), conceded no recall of pants, thought no facial scar, compared length and cropping of his hair to hers and, again, confessed to lack of attention to pants. Such crossexamination may have laid a predicate for impeachment in only one respect—"Did you tell the police he had short brown hair?"—but there was no effective followup, thus no impeachment. Otherwise, the cross-examiner seems to have accepted her answers.