**William BURNS, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 69641.**

Court of Criminal Appeals of Texas, En Banc.

Oct. 19, 1988.

Rehearing Denied Dec. 7, 1988.

James E. Davis, Texarkana, for appellant.

John F. Miller, Jr., Dist. Atty. and James Elliott, Asst. Dist. Atty., Texarkana, Jim Vollers, Robert Huttash, State's Atty., Austin, for the State.

OPINION

CLINTON, Judge.

Appellant was convicted of the offense of capital murder, and, in accordance with affirmative answers rendered by the jury to the three special issues submitted at the punishment phase pursuant to Article 37.-071, V.A.C.C.P., the trial court assessed his punishment at death. Direct appeal to this Court is automatic. *Id.*

Appellant challenges sufficiency of the evidence to support the jury's affirmative answer to special issue two, which inquires "whether there is a probability that the

defendant would commit criminal acts of violence that would constitute a continuing threat to society." Thus we turn to the evidence adduced, beginning with the circumstances of the offense itself, which this Court has repeatedly held may alone sustain an affirmative answer to special issue two if "severe enough." E.g., *King v. State*, 631 S.W.2d 486 (Tex.Cr.App.1982); *Muniz v. State*, 573 S.W.2d 792 (Tex.Cr. App.1978); *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977).

While every murder committed in the course of a robbery is "senseless," *Roney v. State*, 632 S.W.2d 598 (Tex.Cr.App.1982), neither the facts of the instant offense, nor appellant's participation therein, appears so heinous or shocking as to evince a particularly "dangerous aberration of character." *King v. State*, supra, at 504; *Cass v. State*, 676 S.W.2d 589 at 593 (Tex.Cr.App.1984). The record shows that sometime close to midnight on Friday, March 27, 1981, twenty two year old appellant and two companions, his brother Victor, and Danny Ray Harris, proceeded to the Texarkana Wood Preserving Company with the apparent intent to rob whomever they might find working there. Appellant had at one time worked the late shift at the creosote plant, and "would have known" an employee would be working late to stoke the fire in the boiler. Furthermore, appellant could have anticipated this person would be carrying an appreciable sum of money because he knew Friday was payday. There is some indication appellant was under the influence of "dope" of an unspecified powdered variety which he had ingested through his nose sometime shortly before the three set out.

What happened at the creosote plant may be gleaned from a pair of statements appellant gave afterwards. As they approached the plant, appellant carried a .22 caliber Winchester rifle that Victor had retrieved from the trunk of his car. Addi-

tionally, tucked into appellant's pants was a .22 caliber pistol. Through a crack in the tin wall of the "treating room" of the plant, appellant observed Johnny Lynn Hamlett, the deceased, an eighteen year old high school senior, who was working the late shift that night. His cohorts urged appellant to shoot Hamlett with the rifle. Instead appellant handed it to Harris, who stepped around to a "big opening ... on the side where the conveyor belt goes in." Appellant pulled out the pistol and fired off the only two rounds it contained through the crack. Next appellant "heard the rifle start popping off." Ten or eleven shots were fired from the rifle, in appellant's estimation.[1] According to the autopsy, Hamlett died "of multiple gunshot wounds of the neck, chest and head."

Harris took Hamlett's wallet, emptied it of the $110.00 it contained, which he split with Victor, and, after starting to throw the wallet away, gave it instead to appellant, who "didn't have a billfold and ... wanted one." Appellant had the wallet on his person when he was arrested several weeks later. Inside the wallet police found a brief newspaper article chronicling early stages of the investigation of Hamlett's killing.

In final argument the prosecutor invited the jury to find appellant guilty as a party on the basis of the above evidence, thus:

"We had to prove that William Burns did this. You have seen the evidence of that. You have seen and heard his statement where he tells you he shot twice. You remember the law of parties? If you aid, encourage, assist in any way? It's in the charge. You can read it. He told you he did that."

At the punishment stage it was shown that approximately a year before the murder of Hamlett, on the night of February 23, 1980, appellant was involved in another killing in the parking lot of a nightclub. With appellant apparently somewhere near-

---

1. Expert testimony established Hamlett sustained fourteen gunshot wounds. Eight .22 caliber "hulls" shown positively to have been fired from the Winchester rifle were found at the scene. Eleven bullets were recovered from the body. Ballistics tests indicated seven of these could have been fired from the Winchester rifle. Two more were definitely not fired from the Winchester, but could have come from a pistol. Origin of the last two bullets could not be determined to any degree.

by, his brother Victor shot one Leon Callahan in the back. The shot proved fatal. Appellant asked Victor, "did he get him." Then the two Burns brothers "grabbed" Callahan's companion, Bryan Sanders, and forced him into their car. On the way out of the parking lot Victor shot at Callahan's tires. With appellant driving, they started out for Texarkana Lake, where, the brothers told Sanders, he was to be killed. Instead appellant stopped the car on the side of the highway. He told Sanders he had a shotgun in the trunk and proceeded to open it. When Sanders intervened, a fistfight ensued. Within a minute or two a passing Highway Patrolman arrived to stop the altercation. Appellant and his brother were arrested.

Two police officers testified they knew appellant's reputation in the community for being peaceable and lawabiding to be bad. With this, the State rested. No psychological or psychiatric testimony was presented relating to appellant's potential for future dangerousness. Other than the unadjudicated murder and kidnapping, the State presented no criminal record or past criminal history. Appellant produced five citizens and three family members to testify his reputation for peaceableness was good. No other mitigating evidence was admitted.

Over the past dozen years this Court has articulated its standard for appellate review of sufficiency of evidence to support an affirmative answer to special issue two in a number of ways. We have consistently said we view the evidence in the light most favorable to the jury's answer, e.g., *Starvaggi v. State*, 593 S.W.2d 323, 325 (Tex.Cr.App.1979),[2] without clearly explicating what view of the evidence would *be* the most favorable in light of the jury's

constitutional function to weigh any proffered evidence in mitigation. In other instances, seemingly more mindful of that function, we have held that the evidence was such that "the jury was justified in finding that the aggravating factors outweighed the mitigating factors[,]" e.g., *Duffy v. State*, 567 S.W.2d 197, 209 (Tex. Cr.App.1978); *Demouchette v. State*, 591 S.W.2d 488, 492 (Tex.Cr.App.1979); thus suggesting "a more substantive review" of the evidence than had been conducted in other cases. See Dix, Appellate Review of the Decision to Impose Death, 68 Geo.L.J. 97, 151 (1979). As if to disown that notion, however, the Court has at least on one occasion combined these two pronouncements, finding that "the evidence, viewed in a light most favorable to the verdict, is sufficient for the jury to have found that the mitigating factors introduced by appellant did not outweigh the aggravating factors and that there is a probability that appellant would commit acts of violence that would constitute a continuing threat to society." *Green v. State*, 682 S.W.2d 271, 289–90 (Tex.Cr.App.1984).[3] Recent decisions have abandoned altogether the inquiry whether the evidence would justify a jury finding that aggravating factors outweighed mitigation. Instead, the Court has begun to apply an unadulterated *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standard, beginning with *Fierro v. State*, 706 S.W.2d 310 (1986). A typical articulation of the standard appears in *Harris v. State*, 738 S.W.2d 207, at 225–26 (Tex.Cr.App.1986):

"When we view the facts, we must evaluate the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could

---

**2.** *Starvaggi* cites *Warren v. State*, 562 S.W.2d 474 (Tex.Cr.App.1978) and *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1977), as authority for this standard. Although as a practical matter each of those opinions may "view the evidence in the light" Judge Phillips found they do in *Starvaggi*, neither opinion expressly indicates that is the standard being utilized therein.

**3.** Viewing mitigating evidence in the light most favorable to the jury's answer in this particular context may mean in some cases actually considering evidence proffered in mitigation, such

as youth, drug dependency, a history of child abuse, etc., though in a broader sense it may "moderate blameworthiness," nevertheless to militate in favor of an affirmative answer in the narrower confines of special issue two itself. See *Stewart v. State*, 686 S.W.2d 118, 125–26 (Tex.Cr.App.1984) (Clinton, J., dissenting). Thus, not only do we fail to instruct juries they may accord independent weight to factors that are in the broader sense "mitigating," *id.*, manifestly we also fail to recognize the independent significance of such evidence on appeal.

have made the finding beyond a reasonable doubt."

See also *Alexander v. State*, 740 S.W.2d 749, 761 (Tex.Cr.App.1987) ("... applying the 'rational trier of fact' test...."): *Livingston v. State*, 739 S.W.2d 311, 340 (Tex. Cr.App.1987) ("... whether the evidence ... would lead any rational trier of fact to make the finding...."). Thus has the Court narrowed its focus on appeal to "whether a rational trier of fact could have found the elements of Art. 37.071(b)(2), supra, beyond a reasonable doubt[,]" *Keeton v. State*, 724 S.W.2d 58, 61 (Tex.Cr.App. 1987), opining that this appellate standard will adequately serve to "make certain that the death sentence is not 'wantonly or freakishly' imposed[.]" *Id.*, at 63.[4] See also *Beltran v. State*, 728 S.W.2d 382, 389–90 (Tex.Cr.App.1987); *Cockrum v. State*, 758 S.W.2d 577 (Tex.Cr.App. 1988).

■ Measuring the evidence adduced in the instant case to prove future dangerousness against this standard, we find, not without some trepidation, that it is sufficient. Though it is likely the jury accepted the prosecutor's invitation to convict appellant as a party to Danny Ray Harris' act of shooting Hamlett repeatedly with the .22 rifle, appellant himself admitted to firing his pistol twice at the deceased, and at least two of the recovered bullets appear to have come from that gun. See n. 1, *ante*. Though acting at the instigation of his companions, appellant was under no duress or domination so far as the record reveals. Approximately a year before, appellant participated as a party to his brother's killing of another individual, and took a principal role in the aggravated assault and kidnapping of yet another. Thus the record reflects at least a bare repetition of deadly violence on appellant's part toward others. There was evidence, albeit contested, that his reputation for peaceableness was not

good. Finally, a reasonable jury might have inferred from his possession of the newspaper clipping that appellant took a dispassionate, or even prideful view of his part in Hamlett's death.

We would not say on this quantum of evidence that appellant has been proven beyond peradventure to be completely incorrigible. However, following our precedents, we conclude it represents more than a "mere modicum" of evidence to support the jury's conclusion it is probable he would commit criminal acts of violence that would constitute a continuing threat to society. *Jackson v. Virginia*, 443 U.S. at 319–20, 99 S.Ct. at 2789, 61 L.Ed.2d at 573–74. This point of error is overruled.

■ In his second point of error appellant contends the trial court erred in failing to admit testimony offered at the punishment phase of trial from his mother relative to his family background and his employment history. We agree.

Appellant called his mother, Vergie Burns, as his last witness at the punishment phase. She testified appellant was the second oldest of seven children, and that her husband had died six years before trial, which would have been around the time appellant committed the instant offense. Over relevancy objections, counsel next attempted to explore appellant's family and employment background, in the following exchange:

"Q All right, were you and [your husband] together all the time you were married?

[Prosecutor]: Your Honor, ... we would object on the basis of relevance.

THE COURT: Sustained."

Mrs. Burns next testified appellant had grown up in her home and had finished high school. Then:

---

4. Thus, also, have we abandoned any pretense of this Court balancing mitigating and aggravating evidence so as to determine, independently of the jury's verdict, the "appropriateness" or "justness" of imposition of the death sentence in a given case. See *Dix*, supra at 150–51. In view of *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), it is doubtful whether Eighth Amendment or Due Process considerations absolutely require this Court to reweigh punishment evidence, though our "prompt judicial review of the jury's decision" was an important consideration in the Supreme Court's imprimatur of our death penalty scheme. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

"Q What type of jobs did [appellant] have after he finished school?

[Prosecutor] Your honor—excuse me. Once again we would object on the basis of relevancy.

THE COURT: Sustained."

Her brief testimony concluded with her assertion she did not think appellant "will be a threat to anyone in the future."

Immediately before the punishment charge was read, appellant made the following bill of exceptions outside the jury's presence:

"Q Were you and your husband together all the time that you were married? A We separated for a few years, but we still communicated with each other. Q Your Honor, had we been permitted to have that question answered, I would have followed it up with questions to develop it further. Can I do that at this time?

THE COURT: No, that's not a part of that. I sustained the objection to one single question as being immaterial and irrelevant to any issue before the Court. You can make your bill on those questions, only.

Q The other question is as follows, Mrs. Burns. What types of jobs did [appellant] have after he finished school? A He worked at St. Michael's Hospital, he worked over to the wood preserving plant, and he worked at Central Christian Church. Q Is that all? Is that all? A That's all I can think of."

Counsel did not request that the trial court reopen the evidence so that he could propound followup questions before the jury pertaining to appellant's upbringing. See Article 36.02, V.A.C.C.P.

In *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), the Supreme Court held that "consideration of the character and record of the individual offender and the circumstances of the particular offense [is] a constitutionally indispensable part of the process of inflicting the penalty of death." *Id.,* 428 U.S. at 304, 96 S.Ct. at 2991, 49 L.Ed.2d at 961. Because North Carolina's mandatory provi-

sion precluded such consideration, it was struck down as violative of "the fundamental respect for humanity underlying the Eighth Amendment." *Id.* Subsequently, building upon the *Woodson* foundation, a plurality of the Supreme Court held in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), "that the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record or any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.,* 438 U.S. at 604, 98 S.Ct. at 2964–65, 57 L.Ed.2d at 990. Exclusion of such evidence, it was observed, "creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." 438 U.S. at 605, 98 S.Ct. at 2965, 57 L.Ed.2d at 990. A majority of the Court later embraced the holding of *Lockett,* supra, in *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). There the Court opined:

"The sentencer ... may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration."

*Id.,* 455 U.S. at 114–15, 102 S.Ct. at 877, 71 L.Ed.2d at 11. See also *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); *Franklin v. Lynaugh,* 487 U.S. ——, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (O'Connor, J., concurring).

In *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), the Supreme Court premised its recognition of the constitutionality of our death penalty procedure on the understanding that Article 37.-071, supra, would prove sufficiently flexible to allow jury consideration of "all possible relevant information about the individual defender whose fate it must determine." *Id.,* 428 U.S. at 276, 96 S.Ct. at 2958, 49 L.Ed.2d at 941. Citing *Woodson v. North Carolina,* supra, the Court first observed:

"A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed." *Id.*, 428 U.S. at 271, 96 S.Ct. at 2956, 49 L.Ed.2d at 938. The Court then upheld our statutory scheme because it found:

"Texas law essentially requires that one of five aggravating circumstances be found before a defendant can be found guilty of capital murder, and that in considering whether to impose a death sentence the jury may be asked to consider whatever evidence of mitigating circumstances the defense can bring before it. It thus appears that ... the Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death."

In conclusion the Court reiterated:

"By authorizing the defense to bring before the jury at the separate sentencing hearing whatever mitigating circumstances relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function."

*Id.*, 428 U.S. at 276, 96 S.Ct. at 2958, 49 L.Ed.2d at 941.

In *Quinones v. State*, 592 S.W.2d 933, at 947 (Tex.Cr.App.1980), this Court observed, in keeping with *Jurek v. Texas*, and *Lockett v. Ohio*, both supra, that the defendant "was entitled to present evidence of any mitigating circumstances ..., including a broad discussion of his personal and family background." The instant case does not present a question, as in *Quinones*, supra, of whether an instruction was necessary to explain the use the jury could put that evidence to. Indeed, *Quinones* itself teaches that "[t]he jury can readily grasp the logical relevance of mitigating evidence to the issue of whether there is a probabili-

ty of future criminal acts of violence."[5] Thus, we presume the jury will understand the significance of evidence proffered in mitigation, and will give such evidence mitigating weight, at its discretion, in resolving special issues. Today we treat only the question whether such evidence should have been admitted.

We hold that it should have been. Mrs. Burns' answer to the question pertaining to the stability of her marriage during appellant's upbringing at least tended to show a troubled childhood. While failing to request a reopening of the evidence to proffer further questions along these lines before the jury, appellant at least made it clear he was prepared to do so if permitted. That subsequent to finishing high school appellant obtained employment in such venues as a hospital and a church would surely prove informative to a jury engaged in the necessarily speculative enterprise of assessing his ability to coexist peacefully in society.

We have held that Article 37.071, supra, affords the trial court wide discretion at the punishment phase of a capital murder trial in deciding admissibility of evidence. E.g., *Smith v. State*, 683 S.W.2d 393, 405 (Tex.Cr.App.1984); *Turner v. State*, 698 S.W.2d 673, 675 (Tex.Cr.App.1985). We conclude that the trial court in the instant cause abused that discretion in failing to admit Mrs. Burns' answers. It is true that the mitigating impact of those answers would not appear to be compelling in the abstract. On the other hand, though this Court's precedents dictate a finding that the evidence is legally sufficient to support the jury's reply to special issue two, neither do we believe the State's evidence in support of that verdict to be particularly compelling. We cannot say that, on balance, the jury could not have found appellant's proffered evidence of some, perhaps even critical significance. Consistent with *Lockett*, supra, and its progeny, and particularly in light of the limited role this Court has assumed in reviewing appropriateness of

---

**5.** Whether the jury will also understand the "logical relevance" of evidence which has potentially mitigating weight and significance independent of its applicability to special issues is, at least to the mind of the instant writer, a separate question. See *Franklin v. Lynaugh*, supra (O'Connor, J., concurring); *Penry v. Lynaugh*, 832 F.2d 915 (CA5 1987).

death verdicts in capital cases, we cannot tolerate the risk that appellant has been sentenced to death in spite of factors a reasonable jury could find justify the less severe penalty of life imprisonment.

Accordingly, the judgment of the trial court is reversed and the cause is remanded for new trial. Article 44.29(c), V.A.C.C.P.

TEAGUE, J., concurs in the result.

ONION, P.J., and DAVIS, McCORMICK and WHITE, JJ., dissent.

## OPINION TO THE DENIAL OF THE STATE'S MOTION FOR REHEARING

WHITE, Judge.

I dissent to the denial of the State's motion for rehearing, with my gravest concerns revolving around the mitigating evidence issue. I disagree with the way the majority deals with this question for two reasons, both of which are based upon factual distinctions clearly in the record, yet ignored in the majority opinion.

First, the majority recognizes that counsel did not ask the trial court to reopen the evidence; however, they do not consider whether appellant has properly preserved any error. The State urges that the appellant waived error by not further examining the witness, by not developing the relevancy of the proffered question and by not reurging that the evidence be admitted after perfecting his bill.

The record reflects that defense counsel never attempted to develop or argue the relevancy of the excluded questions, but instead acquiesced in the court's ruling. Further, counsel argued on appeal that such evidence was offered to show his troubled childhood and his capability to be gainfully employed. Counsel was never precluded from asking questions concerning these topics, yet he failed to do so. Additionally, following the perfection of his bill of exception, wherein the relevancy of the proffered questions should have presumably been developed, counsel never asked to reopen or requestion the witness nor did

he secure any ruling from the court. At the very least, these viable waiver issues should be addressed by the majority.

Second, I dissent to the majority's harm analysis. The majority found that, because the evidence of future dangerousness was minimally sufficient, the trial court's exclusion of mitigating evidence was harmful. Not only do I factually disagree with the statement that "[w]e would not say on this quantum of evidence that appellant has been proven beyond peradventure to be completely incorrigible," but I am also at a loss to discover when this Court adopted such a standard for sufficiency review of future dangerousness.

This semantical problem aside, the most troublesome error in the majority opinion is the omission of facts and speculation as to evidence in the context of its harm analysis. Once error is found, this Court has codified in Tex.R.App.Proc., Rule 81(b)(2) the *Chapman* "no contribution to the punishment" standard of review to assess harm. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Granted, this is appropriately the harshest harmless error standard of which very few cases will meet. Yet, I find "beyond peradventure" that in the instant case, when the totality of the evidence is given an objective assessment, this standard has been met.

Four facts were excluded: that appellant had worked (1) at a church, (2) at a wood preserving plant, and (3) at a hospital, and (4) that appellant's mother and her husband had been separated for two years. At the outset, the majority fails to acknowledge that some of these facts were already in evidence. The fact that appellant worked at a church and a wood preserving plant were specifically before the jury in detailed fashion. The record at guilt-innocence reflects that appellant worked at the Texarkana Wood Preserving Company for six months and that he also worked at the Central Christian Church mowing lawns. Thus, we are left with only two facts excluded from the jury's consideration: appellant's hospital employment and the two year separation of his parents.

As to appellant's employment at the hospital, this bare fact is of minimal importance. We do not know when and for how long the employment took place. Further, since appellant now argues harm in that exclusion of this fact precluded proof of his capability for gainful employment, this evidence is merely cumulative of his other employment experiences already before the jury.

Concerning the two year separation of appellant's mother and her husband, the single fact that this occurred is all we know. We have no idea at what time in appellant's life this separation occurred nor do we know whether appellant was even aware of the separation. For the majority to conclude that this testimony was probative of a "troubled childhood" constitutes more than mere speculation, but a reweighing of unknown facts in appellant's absolute favor. Such action I simply cannot countenance. The real and most glaring problem in this case is that there is no record evidence before this Court which authorizes the majority's conclusion that the "proffered evidence" was in fact mitigating in nature.

If this Court is going to independently adopt a per se reversible rule for this type of error, it should announce such a rule. Until such a time, I will follow 81(b)(2), the ostensible rule of this Court to assess harm. Based upon the totality of the record, I can freely state beyond a reasonable doubt and without "trepidation" that had the court admitted these two minimally probative facts, they would have made no contribution to the jury's affirmative answers to the special issues.

Probably the only issue with which I could agree with the majority is with the basic rule of law that the exclusion of mitigating evidence at the punishment phase of a capital case could be error. If the majority opinion serves any purpose at all, I hope it stands as a warning that mitigative evidence should be admitted and where excluded, a majority of this Court will obviously strain to find such error to be harmful. It is to this straining to find harm and the majority's failure to contemplate and give fair weight to the totality of the issues and facts of this case that I am forced to respectfully dissent.

ONION, P.J., and DAVIS and McCORMICK, JJ., join this opinion.