OPINION
 

 PER CURIAM.
 

 Appellant was convicted of capital murder for the shooting death of James Joe
 
 [1]
 
 in the course of a burglary, V.T.C.A.Penal
 
 *158
 
 Code, § 19.03(a)(2). At the punishment phase of trial, the jury returned affirmative answers to the three special issues, and appellant was sentenced to death. Article 37.071, (b) & (e), V.A.C.C.P. Appeal is automatic in this Court.
 
 Id.,
 
 (h).
 

 Although there is no challenge to the sufficiency of the evidence to support the jury’s verdict of guilt, a brief recitation of the facts of the offense will illuminate several points of error. Appellant’s cousin Gary Yon Bennett, who had been indicted along with appellant, testified at trial as follows: On January 14, 1988, he and appellant spent most of the day together. At about 8:00 p.m., they drove in appellant’s red Mustang to an area of Dallas near where Yon Bennett's sister lived in a large apartment complex. Their plan was to drive through some apartment complexes looking for something to steal or an apartment to burglarize.
 

 In the second set of apartments they drove through, they spotted a second-sto-rey apartment where it appeared that no one was home. The apartment they selected belonged to one Debra Harris. They parked the car in front of it, then went up and knocked on the door. Receiving no response, they broke open the door and began to collect items to take. Von Bennett went downstairs to open the car trunk and make room in the car to load up some of the stolen items. As appellant came down the stairs with a pillow case full of jewelry and other items, he and Von Bennett both saw a man, later identified as off-duty Dallas Police Officer James Joe, walking across the parking lot towards them. Appellant put the pillow case into the car, then responded to Officer Joe’s questions by saying that they were looking for someone who lived there. Joe, wearing a gray sweatshirt with “Dallas Police Department” printed on the front, and his badge at his waist, identified himself as a security officer for the apartments and told them he had had a call from a tenant that an apartment was being burglarized. Joe remained calm and professional; appellant, by contrast, began to get upset with Joe’s questioning.
 

 While the three were engaged in discussion in the parking lot, Von Bennett noticed a woman come out onto a balcony next to the apartment that he and appellant had been inside, and as he was looking at her, he saw appellant out of the corner of his eye “flinch,” turn, pull a pistol, and shoot Joe once, point blank, in the chest. Von Bennett immediately ran towards one of the apartment buildings and ducked down; he heard three or four more shots as appellant and Joe struggled at the back of the car. When the noise stopped, Von Bennett looked back, but did not see anyone, so he went back towards the car. As he approached, he saw appellant and Joe both lying on the ground near the car, and went over to where appellant was.
 

 Appellant told Von Bennett that he had been shot and needed help. Von Bennett helped him into the car, ran around and jumped into the driver’s seat and drove off, hitting a parked car in the process. On the way out of the complex, they passed a police car that was coming in. Von Bennett drove to his sister’s apartment complex nearby and parked the car. He asked appellant if he knew that the man he had shot was a police officer, and appellant told him he did. Seeing police cars driving into the complex, Von Bennett got out and ran, taking the car keys with him. According to his testimony, he hid behind a building in the area for several hours before escaping. He surrendered to police two days later.
 

 Appellant also got out of the car, but could not run. Other testimony at trial showed that within a short time, he was approached by two plainclothes officers after a citizen spotted him trying to hide under a parked truck as a police helicopter circled overhead. He had apparently crawled to the truck, leaving a trail of blood from the Mustang. The officers testified that when they first approached appellant, they did not arrest him, and in fact did not know whether he was a victim or a suspect, only that he was injured. Shortly, some uniformed officers arrived, who also did not know whether appellant was a victim or a suspect. When they asked him what had happened, he told them that two men had robbed him. The officers soon
 
 *159
 
 decided that they should read appellant his Miranda rights,
 
 [2]
 
 and one of them rode to the hospital in the ambulance with him. Joe died at 9:41 p.m. of a gunshot wound to the chest.
 

 In his first point of error appellant complains that the trial court erred in denying his motion for new trial. His motion was predicated upon a claim that the State denied him a fair trial by failing to disclose “Brady”
 
 [3]
 
 evidence favorable to him which was known to the State prior to trial. The new evidence pertains to a State’s witness, Marilyn Zinn.
 

 Beginning the week after the killing of Joe, Zinn consulted a psychiatrist three or four times for depression, nervousness, and guilt. She felt responsibility for Joe’s death because of the fact that it was she who called him to the scene of the burglary where he was killed. The psychiatrist prescribed a medication Zinn identified as “im-iperine,” which he told her was an antidepressant he was prescribing in a very low dosage. Except for daily thyroid medication, the imiperine is the only drug that she takes or has taken.
 

 Appellant concedes that the test for whether nondisclosure of evidence favorable to the accused amounts to reversible error is one of materiality; and that evidence is “material” in a constitutional sense “only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.”
 
 United States v. Bagley,
 
 473 U.S. 667, at 682, 105 S.Ct. 3375, at 3383, 87 L.Ed.2d 481, at 494 (1985). Appellant argues that the evidence of Zinn’s problem, and the treatment therefor, not only goes to her credibility and state of mind, but would have caused appellant to change his trial strategy, and likely would have caused a different outcome.
 

 Appellant claims that Zinn, a neighbor of the burglarized apartment, was the only State’s witness who could corroborate the accomplice witness testimony of Yon Bennett. He contends that any information which would undermine the credibility of Zinn’s testimony would be critical. We disagree. In the first place, appellant produced no evidence to show the effect, if any, of “imiperine” upon human memory or ability to relate facts accurately and impartially from the witness stand. Absent such a showing, we can only speculate as to how the fact of Zinn’s medication would serve to undermine her credibility, if at all. Moreover, as the State points out, there is other evidence corroborating Von Bennett’s testimony. Article 38.14, V.A.C.C.P. does not require that the testimony of an accomplice witness in a capital murder case corroborate the accused’s connection to the specific element which elevates the offense from murder to capital murder.
 
 Holladay v. State,
 
 709 S.W.2d 194, 199 (Tex.Cr.App.1986). See also
 
 Losada v. State,
 
 721 S.W.2d 305, 309 (Tex.Cr.App.1986). Therefore, the State does not need Zinn’s testimony to establish the underlying burglary. In any event, items from Debra Harris’ apartment were found in appellant’s car at the time of his arrest, and that would suffice. Cf.
 
 Tolley v. State,
 
 717 S.W.2d 334 (Tex.Cr.App.1986) (possession by accused of items shown to have been taken in burglary sufficient to corroborate accomplice witness testimony that accused participated in the burglary). Nor was Zinn’s testimony needed to corroborate Von Bennett’s testimony that it was appellant who shot Joe. Appellant himself testified at trial that he did. Joe’s gun was also found in appellant’s Mustang. In short, Zinn’s testimony was hardly indispensable to corroborate Von Bennett. Thus, even had appellant met his burden to explain how the purported “Brady” evidence would have impeached her testimony, he has not shown that impeaching her testimony would have greatly impacted his case. The trial court could readily have concluded that there is no reasonable probability that disclosure of Zinn’s psychiatric treatment would have changed the result of trial.
 
 United States v. Bagley,
 
 supra. It therefore was not
 
 *160
 
 error to deny appellant’s motion for new trial. His first point of error is overruled.
 

 In points of error two through six, appellant argues that the two pistols and the various possessions of Debra Harris, owner of the burglarized apartment, which were seized from within his car, the red Mustang, should not have been admitted into evidence. He contends that the search warrant was based on a faulty affidavit, the search went beyond the scope authorized by the warrant, the police could not have been acting in objective good faith in relying on the warrant, and there were no exigent circumstances that justified entry and search without a warrant.
 

 Initially, we note that if the police were justified in seizing the evidence complained of without a warrant, there is no need to reach appellant’s arguments concerning the validity of the warrant. Actual procurement of a warrant, even on the basis of an unsatisfactory affidavit, will not preclude appellate review “to determine whether the search can be upheld under a warrant exception.”
 
 Adkins v. State,
 
 717 S.W.2d 363 (Tex.Cr.App.1986). The trial court found both probable cause and exigent circumstances to search the Mustang. Appellant disputes the exigent circumstances aspect of this finding.
 

 The record discloses the following relevant facts:
 
 [4]
 
 After he received the phone call from Zinn reporting the suspicious noises and activities, Joe called for a police back-up to investigate a possible burglary. As one of the marked police cars, carrying two officers, arrived to serve as back-up, at least one of the officers saw a red Mustang hit a parked car, then race out of the apartment complex through the driveway which the police car, going in the opposite direction, was
 
 coming
 
 in. The officer turned his car around and, joined by another marked police car, pursued the red Mustang but lost it after it turned into the parking lot of another nearby apartment complex. The officers then heard a radio report of the shooting and returned to the location where it had occurred. A citizen witness gave them the license plate number of the red Mustang,
 
 [5]
 
 which he had seen hit the other car and then drive away. Within approximately ten minutes, two plain clothes police officers and the police helicopter had located the red Mustang in the parking lot of the second apartment complex, with appellant, wounded, on the ground nearby. Several uniformed officers went to assist them. Through the rolled up windows, the officers were able to see inside the Mustang two handguns with blood on them, as well as blood on the car seat. There was also blood on the outside of the passenger door. They could see various items in the back seat, including two pillow cases, and could tell that they contained objects with edges and protrusions that plainly were not pillows. By that time, they knew that the shooting reported was related to a suspected burglary at the first apartment complex, that Joe had been severely injured or killed, that there were indications that two black men had been involved in the burglary and shooting, and that one of them had also been wounded. One of the officers knew what kind of gun Joe carried, and recognized one of the guns in the car as the same type of gun. They also saw a trail of blood between the car and the spot where appellant, wounded and bleeding, was found on the ground trying to hide from the police helicopter. The police did not know where the second suspect was, nor where the keys to the Mustang were.
 

 In an abundance of caution the police obtained search warrants for the guns before opening the car and seizing any evidence. On the facts presented here,
 
 *161
 
 they could have lawfully performed a war-rantless search under the automobile exception to the warrant requirement.
 
 Chambers v. Maroney,
 
 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970);
 
 Christopher v. State,
 
 639 S.W.2d 932, 935 (Tex.Cr.App.1982). Based on the totality of the circumstances, the officers on the scene had probable cause to believe that both the red Mustang and some of its contents were associated with criminal activity.
 
 Illinois v. Gates,
 
 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983);
 
 Eisenhauer v. State,
 
 754 S.W.2d 159 (Tex.Cr.App.1988);
 
 Bower v. State,
 
 769 S.W.2d 887 (Tex.Cr.App.1989). As the officers testified at trial, they had knowledge and experience that burglars frequently use pillow cases to carry off loot from a burglary, so the presence of pillow cases filled with miscellaneous items other than pillows in a car fleeing the scene of a burglary and shooting certainly gave them probable cause to believe that the pillow cases in the car contained fruits of the possible burglary which had been reported at the first apartment complex.
 
 Texas v. Brown,
 
 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).
 

 The officers also knew that the car contained two guns and blood.
 
 [6]
 
 They knew that following the suspected burglary report at the first apartment complex there had been a report of a shooting in which at least one person was shot; they knew that Joe was that person, and that his gun was not found on him, although his gun holster was; they also knew that one of the guns in the car was the same type of gun that Joe owned and carried. All of these facts combined to give them probable cause to believe that the car and its contents were connected to the shooting of Joe.
 

 The “totality of the circumstances” approach in determining probable cause established in
 
 Gates,
 
 supra, applies to war-rantless as well as warrant searches.
 
 United States v. Mendoza,
 
 722 F.2d 96 (C.A.5 1983);
 
 Angulo v. State,
 
 727 S.W.2d 276, 278 (Tex.Cr.App.1987). Once probable cause to believe that the car contained evidence of a crime was established, the officers could conduct a valid search of the car immediately, without a warrant.
 
 Chambers v. Maroney,
 
 supra. It may be that where police come upon an automobile that is parked, and a suspect is in custody, something more than the inherent mobility of the vehicle is needed to establish exigency to justify a warrantless search. See 3 LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 7.2(a) (2d ed. 1987) at 28-30;
 
 Gauldin v. State,
 
 683 S.W.2d 411 (Tex.Cr.App.1984). But see
 
 California v. Carney,
 
 471 U.S. 386, at 392-93, 105 S.Ct. 2066, at 2070, 85 L.Ed.2d 406, at 414 (1985);
 
 Martin v. State,
 
 780 S.W.2d 497 (Tex.App.—1989 pet. ref’d). At any rate, the fact that an accomplice is still at large will serve to supply any further exigency requirement.
 
 LaFave,
 
 supra, at 30;
 
 Gauldin,
 
 supra, at 414. We conclude that the items taken from the burglarized apartment and the guns were all legally seized pursuant to the automobile exception to the search warrant requirement. The trial court did not err to admit them at trial. Appellant’s points of error two through six are overruled.
 

 Appellant’s seventh point of error challenges the sufficiency of the evidence to support the jury’s affirmative finding on the second special issue, Article 37.-071(b)(2), supra, which inquires “whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]” In reviewing the sufficiency of the evidence on the second special issue, we view the evidence in the light most favorable to the verdict to determine whether any rational jury could have found that the elements of Article 37.071(b)(2), supra, were established by the State beyond a reasonable doubt.
 
 Keeton v. State,
 
 724 S.W.2d 58, 61 (Tex.Cr.App.1987). Because the facts of the offense have a bearing on the issue of appellant’s future dangerousness, we will review all evidence from both the guilt and punishment phases of trial.
 

 
 *162
 
 Where there is evidence that a defendant’s actions in killing his victim were calculated and coldly planned and executed, such evidence has been held to be sufficient in itself to support an affirmative finding to the special issue on future dangerousness. E.g.,
 
 Bower v. State,
 
 at 895. The only direct testimony about how the shooting happened came from appellant and Von Bennett, whose versions differed dramatically.
 
 [7]
 
 Viewing the evidence in the light most favorable to the jury’s finding, this was an essentially unprovoked shooting, comparable to the shooting in
 
 Keeton v. State,
 
 supra, but arguably more impulsive. In
 
 Keeton,
 
 even though we called the shooting "senseless, unnecessary, and coldblooded,” 724 S.W.2d at 64, we held the evidence insufficient to support an affirmative answer to the special issue on future dangerousness. If the similarity between these two shootings were all we had to consider, it might well be that we should find the evidence on future dangerousness here insufficient, especially given the apparently impulsive nature of the shooting. However, in the instant cause we also have evidence of an extensive criminal history, and expert testimony on the issue of future dangerousness.
 

 Appellant’s criminal history includes four burglaries, a felony theft, several auto thefts involving dangerous high speed chases, and a prior assault upon a police officer in the course of an arrest after one such episode. There was testimony from psychiatrist Dr. James Grigson “that most certainly an individual such as you described [in a hypothetical question based on appellant’s criminal history and the facts of this case] is going to be a threat to people in our society no matter where they are, whether in confinement or in the free world.” Grigson testified that the person described in the hypothetical question had an anti-social personality disorder, showed a disregard for authority and the lives of other people, and showed an escalation of dangerous and violent behavior.
 

 After reviewing all of the relevant evidence, including Grigson’s testimony, in the light most favorable to the verdict, we cannot say that a rational jury could not have found the evidence sufficient to support an affirmative answer to the second special issue beyond a reasonable doubt.
 
 Burns v. State,
 
 761 S.W.2d 353 (Tex.Cr.App.1988);
 
 Mitchell v. State,
 
 650 S.W.2d 801 (Tex.Cr.App.1983). Appellant’s seventh point of error is overruled.
 

 In points of error eight and nine appellant contends it was error to allow opinion testimony from Dr. Grigson as to his sanity and the deliberateness of his conduct in response to a lengthy hypothetical question. Appellant presents us with a hodgepodge of complaints in these points of error. We will address his arguments as best we understand them, and to the extent they were preserved by objection at trial.
 

 Prior to Grigson’s testimony the jury was excused and the prosecutor questioned him briefly, announcing that he proposed to ask Grigson on the basis of a hypothetical question for an opinion within reasonable medical certainty on three issues: whether the hypothetical appellant was sane or insane; whether the hypothetical appellant could be diagnosed as having an antisocial personality disorder; and whether the hypothetical appellant would likely pose a future danger to society. Grigson answered that, given a sufficiently detailed hypothetical, he could express an opinion on those three questions. On cross-examination counsel for appellant ascertained that Grigson had not examined appellant and tried to get him to acknowledge that the ability of psychiatrists to accurately predict future behavior is not generally accepted in the psychiatric profession — with little success.
 

 Following this short hearing the trial court asked appellant whether he had an objection to Grigson’s proposed testimony.
 

 “[APPELLANT’S COUNSEL] Yes, Sir. We believe this witness has no basis at this time for giving an opinion at all.
 
 *163
 
 We don’t believe that psychiatry is such an exact science or that the field of psychiatry and those engaged in it are of such an agreement that this is an acceptable course of action as to make this opinion any more useful than asking a man off the street what his opinion about future behavior would be and we object to the introduction of this we intend [sic: opinion?] by the use of hypothetical.
 

 THE COURT: Well, the Court will overrule your objection at this time and will allow the witness to testify. If you have an objection at the time the hypothetical is completed, you may make your objection at that time because I don’t know what the hypothetical question is going to be either, so I’m not precluding you from making further objections as we proceed.”
 

 The prosecutor then propounded a lengthy hypothetical to Grigson before the jury, enumerating appellant’s long history of burglary, auto theft and, in one case, resisting arrest, as had already been established at the punishment hearing. After-wards, true to his word, the prosecutor asked Grigson “whether or not the man in our hypothetical fact situation is sane or insane?” Counsel for appellant renewed his earlier objection, adding, “He does not have any foundation in either science or in sufficient fact bases to render an opinion to reasonable medical certainty.” Appellant did not renew his objection when Grigson characterized the “hypothetical man” as suffering from antisocial personality disorder. In context of answering negatively the prosecutor’s question whether this disorder is “just a stage he’s going through that he’s going to grow out of[,]” Grigson alluded to that part of the hypothetical containing the offense on trial, characterizing it as “deliberate intentional.” Appellant objected: “He’s injecting his views on another matter which is an ultimate issue of fact which he’s not been asked to give an opinion on at this time.” Finally, when the prosecutor elicited Grigson’s opinion on future dangerousness, appellant “renew[ed] our objections previously made of this witness’ testimony.” All objections were overruled.
 

 Appellant argues that Grigson’s testimony as to sanity and deliberateness were inadmissible over objection under Tex.R.Cr.Evid., Rule 702.
 
 [8]
 
 Judging from the objection he posed at trial, we construe appellant to argue that when given in response to a hypothetical question, an expert opinion on the issues of sanity and deliberateness is not such as “will assist the trier of fact to understand the evidence or to determine a fact in issue[.]”
 
 Id.
 
 (“We don’t believe that psychiatry is such an exact science or that the field of psychiatry and those engaged in it are of such an agreement
 
 that this is an acceptable course of action as to make this opinion in any way more useful than asking a man off the street what his opinion ... would be
 
 and we object to introduction of this we intend [sic: opinion?]
 
 by the use of hypothetical")
 
 This Court has already determined that hypothetical questions are an acceptable means of eliciting an expert opinion on the issue of future dangerousness, so long as the hypothetical is based upon facts in evidence.
 
 Mays v. State,
 
 726 S.W.2d 937, at 950-51 (Tex.Cr.App.1986). Accordingly, appellant limits his complaint now to use of a hypothetical to obtain an expert opinion on sanity and deliberateness.
 
 [9]
 

 A trial court’s decision that an expert’s testimony will be useful to the jury should only be overturned for an abuse of discretion. Goode, Wellborn and Sharlot, 33 Tex
 
 *164
 
 as Practice: Texas Rules of Evidence: Civil and Criminal § 702.2 (1988). Grigson testified that he had examined over 12,000 persons who had been accused of criminal conduct. A trial court could rationally conclude that this experience would equip Grigson to make judgments about sanity and deliberateness with greater accuracy, even if only marginally so, than laypersons confronted with the same underlying data. Assuming they are relevant inquiries at the punishment stage, the trial court did not abuse its discretion in deciding that the opinion of a psychiatrist bearing on these matters could assist the jury.
 

 Nevertheless, although he does not invoke Tex.R.Cr.Evid., Rule 705(c),
 
 [10]
 
 appellant seems to argue that hypothetical questions are,
 
 per se,
 
 an insufficient basis for an expert to form an opinion as to an accused’s sanity. Appellant established that Grigson had not personally examined appellant. He now argues that because Article 46.03, § 3, V.A.C.C.P., provides for examination of an accused by experts prior to testifying with regard to an insanity defense at the guilt phase of a criminal trial, expert opinion predicated upon a hypothetical question is not permissible. However, nothing in Article 46.03, § 3, prohibits opinion testimony based on a hypothetical at the punishment phase of trial. The new rules of evidence in general continue to sanction use of hypotheticals to elicit expert opinion testimony. See Tex.R.Cr.Evid., Rule 703;
 
 Goode, Wellborn and Sharlot,
 
 supra, § 703.2. Grigson testified that, given a sufficiently detailed hypothetical, he could in fact provide an informed opinion on appellant’s sanity. Although this testimony was certainly self-serving, the trial court heard no contrary evidence. Again assuming it is a relevant inquiry at the punishment phase of trial, see n. 10,
 
 ante,
 
 we cannot say that no hypothetical question will suffice to form the basis for expert opinion as to sanity. Appellant has not argued, either at trial or on appeal, in what way the particular hypothetical question used in this case was insufficient to form the basis of expert opinion on either sanity or deliberateness. We hold the trial court did not abuse its discretion in failing to exclude Grigson’s testimony as to sanity. See Rule 705(c), supra.
 

 Appellant also complains that Grigson’s testimony as to the deliberateness of the offense took him “into the province of the first question of deliberateness” under Article 37.071(b), supra. Opinion testimony is not objectionable, however, simply on the basis that it “embraces an ultimate issue to be decided by the trier of fact.” Tex.R.Cr. Evid., Rule 704. Furthermore, appellant complains, the opinion was not responsive to the question posed. But as the State points out in reply, the characterization of the offense as “deliberate intentional” came in context of Grigson’s answer to the question, not specifically objected to, whether appellant’s anti-social personality disorder would likely abate over time. Grigson was describing an escalation in severity of crimes in appellant’s history as evidence his disorder was not, in fact, abating. We hold that the trial court did not err to overrule appellant’s objection on the basis that Grigson’s answer was nonre-sponsive. Appellant’s eighth and ninth points of error are overruled.
 

 Accordingly, the judgment of the trial court is affirmed.
 

 [1]
 

 . James Joe was a Dallas police officer who was off duty at the time of the burglary and shooting, but was called to investigate in his capacity as a security guard for the apartment complex where he and his wife lived.
 

 [2]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [3]
 

 .
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
 

 [4]
 

 . The trial court deferred ruling on appellant’s motion to suppress until midway through trial on the merits, without complaint by the parties. We therefore consider facts adduced at the pretrial hearing on the motion to suppress, as well as those adduced in the early portions of trial testimony. See
 
 Hardesty v. State,
 
 667 S.W.2d 130, at 133 n. 6 (Tex.Cr.App.1984).
 

 [5]
 

 . Marc Newman, another tenant of the apartment complex where the shooting took place, identified the car that hit Lamkin’s as a red Mustang with license plate number TCM315. Appellant’s car was a red Mustang with license plate number TCW315.
 

 [6]
 

 . In this case, the car itself was possibly subject to warrantless seizure as evidence in the hit and run, and also as an instrumentality of the burglary.
 
 Christopher v. State,
 
 supra at 935.
 

 [7]
 

 . Although Zinn testified that she watched the three men as they stood in the parking lot, heard the shots, and saw Officer Joe fall, she never saw the guns and thus could not describe the shooting in any detail.
 

 [8]
 

 . Rule 702 reads:
 

 "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”
 

 Contrary to the suggestion of his brief, appellant did not specifically invoke this provision at trial.
 

 [9]
 

 . Neither at trial nor on appeal does appellant raise a question whether evidence of his sanity has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Tex. R.Cr.Evid., Rule 401. We do not reach that question here.
 

 [10]
 

 . Rule 705(c) reads:
 

 "If the court determines that the expert does not have sufficient basis for his opinion, the opinion is inadmissible unless the party offering the testimony first establishes sufficient underlying facts or data."