COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-06-089-CR

 

 

ANDREW WAMSLEY                                                            APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM THE 297TH
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. Introduction

In twelve points, Appellant Andrew Wamsley
appeals his conviction of capital murder.  We affirm. 

 

 








II. Factual and Procedural History

On December 11, 2003, Mansfield police were
dispatched to the house of Rick and Suzanna Wamsley in response to a 911
call.  Upon their arrival, the police
discovered Rick and Suzanna dead inside their home.  After a sweep of the house, the police found
no signs of forced entry.  The police
determined that Rick died as a result of multiple gunshot wounds and stab
wounds to his head and chest, while Suzanna died as a result of a single
gunshot wound to her head and multiple stab wounds to her chest.

The Wamsleys= son,
Appellant, was charged with capital murder. 
The State=s principal witness, Susana
Toledano, testified that she, Appellant, and Chelsea Richardson murdered the
Wamsleys on the morning of December 11. 
Toledano provided the State with a sample of her DNA, which matched
evidence found at the murder scene. 
Toledano agreed to testify against Appellant in exchange for a life
sentence for the lesser offense of murder. 
Toledano testified that Appellant murdered his parents because he wanted
the money from a million dollar life insurance policy covering Rick. 








Appellant pleaded not guilty; however, the jury
found Appellant guilty as charged in the indictment.  The State sought the death penalty, but the
jury returned a Ano@ answer
to the future dangerousness special issue. 
Thus, the trial court imposed punishment of life imprisonment.  Appellant brought this appeal.

III. Challenge to Venire Panel

In Appellant=s first
point, he contends that the trial court erred by preventing a veniremember from
exercising a juror exemption.  In
Appellant=s second and third points, he
asserts that he was deprived the intelligent use of his peremptory and cause
challenges when the trial court refused to allow him the opportunity to
question two veniremembers regarding changes in their circumstances. 

A. Applicable Facts

Voir dire began on January 12, 2006.  Appellant challenged juror thirty-one, Joseph
McCrary, for cause based on his views about the punishment range for the lesser
included offense of murder, as well as his response to special issue two
dealing with the death penalty.  The
trial court denied the challenge for cause. 
Appellant next challenged juror thirty-two, Linda Zimmerman, for cause
based on her response to special issue two. 
The trial court denied this challenge as well. 








On February 17, 2006, Appellant filed a motion
for additional peremptory challenges. 
The motion asserted that because the trial court had denied Appellant=s
challenges for cause against certain veniremembers on January 12, Appellant
would now have to exercise peremptory strikes against them.  Within the motion was a list of the
veniremembers against whom Appellant intended to exercise peremptory strikes
against; both Joseph McCrary and Linda Zimmerman were included.     

That same day, those veniremembers who had not
been excused or successfully challenged for cause on January 12 were
reassembled so that the State and defense might exercise peremptory
challenges.  At this time, the trial
court notified the parties that two jurors had contacted the bailiff to inform
the court of changes in their circumstances that had occurred subsequent to
their qualification and that may affect their ability to serve.  Juror thirty-one, McCrary, informed the
bailiff that he had recently enrolled in a college course and would like to
claim a student exemption, while juror thirty-two, Zimmerman, notified the
bailiff that her mother had suffered serious health complications the previous
weekend and that her death was imminent.








Appellant requested the opportunity to question
both veniremembers on the issues they raised to determine whether their changes
in circumstances would permit the trial court to excuse them under article
35.03 of the Texas Code of Criminal Procedure, or would otherwise impact their
ability to hear the case.  Tex. Code Crim. Proc. Ann. art. 35.03
(Vernon Supp. 2007).  The trial court
refused Appellant=s request to question the venire
members and also refused to excuse McCrary, stating that it was too late for
him to claim a student exemption. 
Appellant objected, asserting that a juror could claim an exemption up until
the time the jury is empaneled.  Appellant
then challenged veniremember Zimmerman for cause for a second time, and once
again the trial court denied the challenge. 
Subsequently, Appellant=s
defense counsel used peremptory strikes to exclude both McCrary and Zimmerman
from the jury.  Appellant requested an
additional peremptory challenge to be used on the next juror considered; the
court granted the request as to this specific juror, but denied all of
Appellant=s further requests for
additional peremptory challenges. 

B. Trial Court=s
Refusal to Excuse Juror Number 31

In Appellant=s first
point, he argues that the trial court erred by preventing veniremember McCrary
from exercising his student exemption.  








Texas Code of Criminal Procedure article 35.03
gives a trial court broad discretion to excuse prospective jurors for good
reason.[2]
 Tex. Code Crim. Proc. Ann. art. 35.03;
Crutsinger v. State, 206 S.W.3d 607, 608 (Tex. Crim. App. 2006).  Under article 35.03, Athe
court shall . . . hear and determine excuses offered for not serving as a
juror, and if the court deems the excuse sufficient, the court shall discharge
the juror or postpone the juror=s
service.@  Tex.
Code Crim. Proc. Ann. art. 35.03. 
Under section 62.106(1)(a)(3) of the Texas Government Code, a person may
establish an exemption from jury service if the person is enrolled and in
actual attendance at an institution of higher education. Tex. Gov=t Code Ann. ' 62.106(1)(a)(3)
(Vernon 2005).  This is a personal,
optional exemption from jury service, which may be invoked by a venireperson.  Burks v. State, 876 S.W.2d 877, 891 (Tex.
Crim. App. 1994).  It does not provide
for a statutory exclusion or mandatory disqualification.  Id.  A trial court retains the authority to excuse
a venireperson up until the time the entire jury has been empaneled and
sworn.  See Rousseau v. State, 855
S.W.2d 666, 676-77 (Tex. Crim. App. 1993) (holding that when a veniremember who
had already been questioned and qualified to serve subsequently advised the
court that she wished to claim a childcare exemption, the court retained
authority under article 35.03 to dismiss her from jury service). 








The trial court abuses its discretion when it
arbitrarily or unreasonably excuses a juror, without reference to any guiding
rules and principles.  See Montgomery
v. State, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990); Gregg v. State,
881 S.W.2d 946, 950‑51 (Tex. App.CCorpus
Christi 1994, pet. ref=d).  Under an abuse of discretion standard, an
appellate court may reverse a trial court=s
decision only when it appears that the court applied an erroneous legal
standard, or when no reasonable view of the record could support the trial
court=s
conclusion under the correct law and the facts viewed in the light most
favorable to its legal conclusion.  See DuBose v. State, 915 S.W.2d 493, 497‑98
(Tex. Crim. App. 1996).  Even if the
appellate court would have reached a different result, it should not intercede
as long as the trial court=s ruling
was within the Azone of reasonable disagreement.@  Montgomery, 810 S.W.2d at 391. 

Appellant contends that the trial court erred by
denying McCrary of his absolute right to exercise his student exemption.  We disagree. 
Although an exemption is both personal and optional as to the
venireperson, the juror has no absolute right to the exemption as it is neither
a statutory exclusion nor a mandatory disqualification.  Burks, 876 S.W.2d at 891.  Although the trial court could have excused
McCrary, it was not required to do so.[3]  Thus, Appellant=s
assertion that McCrary had an absolute right to claim his exemption is simply
unfounded.  








Furthermore, excuses are considered on a
case-by-case basis and are within the broad discretion of the court.  Jasper v. State, 61 S.W.3d 413, 424 (Tex.
Crim. App. 2001).  Here, the record shows
that McCrary was not a student at the time of individual voir dire, but only
later chose to enroll in college courses. 
By this point, McCrary had already been questioned at length and had
been qualified to sit on the jury of a capital murder case.  Nothing in the record indicated that McCrary
was unfit to serve for any purpose. 
Based on the preceding facts and the trial court=s
interest in assuring that a sufficient panel existed from which to choose a
jury, it was well within the trial court=s
discretion to reject McCrary=s
request to be excused from further proceedings. 

Therefore, we conclude that the trial court did not abuse its
discretion in refusing to allow McCrary to claim a student exemption.  See Montgomery, 810 S.W.3d at
380.  Accordingly, we overrule Appellant=s first
point. 

C. Alleged Denial of
Intelligent Use of Peremptory Strikes and Challenges for Cause

 

In Appellant=s second
and third points, he contends that because the trial court erroneously denied
his request to question veniremembers McCrary and Zimmerman about changes in
their circumstances that occurred after they had been qualified to serve, he
was unable to intelligently exercise his peremptory strikes and challenges for
cause. 








1. Applicable Law

The Sixth Amendment guarantees the assistance of
counsel and the right to a trial before an impartial jury.  Franklin v. State, 138 S.W.3d 351, 354
(Tex. Crim. App. 2004).  Part of the
constitutional guarantee of the right to an impartial jury includes adequate
voir dire to question veniremembers in order to 
identify unqualified jurors and intelligently exercise peremptory
challenges and challenges for cause.  See id. 
When a defendant is prevented from questioning the venire, he is
prevented from obtaining information, which implicates constitutional
protections.  Id. at 356. 

2. Analysis

Here, the trial court refused Appellant=s
request to question veniremembers McCrary and Zimmerman on whether the changes
in their circumstances would warrant dismissal under article 35.03 or would
otherwise impact their ability to hear the case.  See Tex.
Code Crim. Proc. Ann. art. 35.03. 








After reviewing the record, we conclude that if
the trial court had permitted additional questioning of McCrary and Zimmerman
regarding their changed circumstances, the questioning could have yielded
information that could have led to the exercise of a challenge for cause.  Although there is no Apersonal
business@ reason
set out as grounds for a challenge for cause in the statute, the court of
criminal appeals has held that a challenge for cause may be asserted based on a
juror=s
inability to give fair consideration to the case due to personal concerns.  See Tex.
Code Crim. Proc. Ann. art. 35.16(a), (b), or (c) (Vernon Supp. 2007); Burks,
876 S.W.2d at 896.  Thus, Appellant
should have been permitted to further question McCrary and Zimmerman regarding
their changed circumstances because additional questioning may have revealed
whether they would have been unable to give fair consideration to the case.  See Burks, 876 S.W.2d at 896.

3. Harm Analysis








The harm analysis traditionally applied to the
erroneous denial of a defendant=s
challenge for cause also applies to the erroneous prohibition of proper
questioning of individual prospective jurors.  Anson v. State, 959 S.W.2d 203, 204 (Tex.
Crim. App. 1997), cert. dismissed, 525 U.S. 924 (1998).  When a trial court erroneously prohibits a
defendant from properly questioning individual prospective jurors, the
defendant suffers harm if he has been forced to use a peremptory challenge he
would not have otherwise used but for the trial court=s error.
 Id.  A reviewing court may determine that the
defendant was harmed only if the defendant (1) exhausts all of his peremptory
challenges, (2) he requests more challenges, (3) his request is denied, and (4)
he identifies an objectionable person seated on the jury on whom he would have
exercised a peremptory challenge.  Id.
(citing Janecka v. State, 937 S.W.2d 456, 470‑71 & n. 9 (Tex.
Crim. App. 1996) (per curiam)). 
Essentially, a defendant is harmed only if he was forced, in effect, to
blindly exercise a peremptory challenge as to a single veniremember to prevent
him from sitting on the jury, and this preventative use of the peremptory
challenge subsequently results in the deprivation of a peremptory challenge he
would have used later on.  See Janecka,
937 S.W.2d at 470.








Although we have determined that the trial court
erroneously prohibited Appellant from asking proper questions of certain
individual prospective jurors, Appellant=s claim
that he was unable to intelligently exercise his challenges for cause and
peremptory strikes must nevertheless fail because Appellant was not forced to
exercise peremptory challenges on McCrary and Zimmerman due to the trial court=s
error.  After jury selection was
completed, Appellant made a bill of exception in which McCrary testified that
if he were required to serve on the jury, his professors were willing to work
with him regarding his absence. Zimmerman also testified and stated that if she
had been forced to serve as a juror Ait would
have been tough@ considering her mother=s death
was imminent, but that she would have been able to give Appellant a fair
trial.  The testimony developed by
Appellant in the bill of exception indicates that neither McCrary nor Zimmerman=s
personal concerns would have prevented or impaired their performance of their
duties as jurors, or would have kept them from being fair and impartial
jurors.  Thus, Appellant was not harmed by
the trial court=s refusal to allow additional
questioning because Appellant=s own
bill of exception shows that such questioning would not have revealed grounds
for a challenge of cause. 








Furthermore, Appellant cannot plausibly claim
that had the trial court allowed him to question McCrary and Zimmerman
regarding their changed circumstances he still would not have exercised his
peremptory strikes on them. The record shows that after Appellant=s
initial challenges for cause of McCrary and Zimmerman were denied, Appellant
filed a motion for additional peremptory challenges in which he specifically
named McCrary and Zimmerman as two persons he wished to exercise his peremptory
strike on based on answers they had given during individual voir dire.[4]  Appellant filed this motion before any
peremptory strikes were used and prior to learning that McCrary and Zimmerman
had notified the trial court of their changed circumstances.  Based on these facts, we are not convinced
that Appellant was forced to Ablindly@
exercise his peremptory challenges on McCrary and Zimmerman because the trial
court denied him the opportunity to ask them additional questions or denied his
challenges for cause.  See Janecka,
937 S.W.2d at 470.  The record
demonstrates that Appellant already intended to strike these two individuals
based on their individual voir dire answers; thus, his contention that he would
have used the peremptory challenges he wasted on McCrary and Zimmerman on
other, less favorable jurors is simply not believable.  See id.  Accordingly, we hold that the trial court=s error
in denying additional questioning did not contribute to Appellant=s
conviction or punishment, and so we overrule Appellant=s second
and third points.

IV. Motion to Quash

In Appellant=s
twelfth point he argues that the trial court erred in denying his motion to
quash the jury panel due to noncompliance with proper jury selection procedures
when, without a presiding judge and outside of his presence, the prospective
jurors submitted juror cards and were granted purported disqualifications and
excuses. 

 

 








A. Applicable Law








Texas Code of Criminal Procedure article 35.03,
section 2 provides that under a plan approved by the commissioner=s court
of the county, Ain a case other than a capital
felony case, the court=s designee may hear and
determine an excuse@ and postpone a juror=s
service.[5]
 Tex. Code Crim. Proc. Ann. art. 35.03, ' 2; Chambers
v. State, 903 S.W.2d 21, 29 (Tex. Crim. App. 1995).  The court of criminal appeals has previously
held that when article 35.03 section 2 is viewed in the context of the jury
formation process, the language does not prohibit the general assembly judge
from designating personnel to make such decisions.  Chambers, 903 S.W.2d at 30.  This is because at the time the summoned
jurors apply for excuses, they have not been assigned to any particular case.  Id.  There is no way of knowing what kind of case
the prospective jurors would subsequently be assigned to, capital or noncapital.
 Id. Thus, article 35.03(2) should
be construed as referring only to the distinction between a special venire and
the formation of panels through a general assembly.  Id.  In the case of a special venire called in a
capital case, the trial judge cannot designate others to make decisions with
respect to excuses. Id. 

B. Analysis

Paula Morales, a jury bailiff for Tarrant County,
testified that on January 12, 2006 prospective jurors were assembled in a
general jury pool.  Morales and her staff
heard requests for exemption and disqualifications, and they subsequently
excused a number of individuals before a jury panel was assigned to Appellant=s
case.  From the remaining pool, one
hundred and fifty individuals were sent to comprise the jury panel for this
case. 








Appellant argues that because he was charged with
a capital crime, article 35.03(2) requires that the trial court, rather than
Morales and her staff, hear excuses and determine disqualifications.  However, we conclude otherwise.  Here, the potential jurors that were granted
excuses by court designees were general assembly veniremembers who were not
assigned to Appellant=s case or any other particular
case.  Nor had a special venire been
granted.[6]  Therefore, under the existing interpretation
of article 35.03(2), the fact that this is a capital murder case does not
prohibit the general assembly judge from designating personnel to make such
decisions.  Chambers, 903 S.W.2d
at 30. 

Appellant further contends that because the
veniremember=s excuses and disqualifications
were not handled in either his or his attorney=s
presence, the panel should have been quashed. 
Again, we hold otherwise.  Texas
Code of Criminal Procedure article 33.03 provides in relevant part that A[i]n all
prosecutions for felonies, the defendant must be personally present at the
trial[;]@
however, the general assembly is not considered part of Appellant=s trial
because particular jurors who were summoned had not been assigned to a
particular case.  See Chambers,
903 S.W.2d at 31.  For this reason,
neither Appellant nor his counsel were entitled to be present; therefore, the
trial court did not err in refusing to quash the panel.  See id.  Accordingly, we overrule Appellant=s
twelfth point.

 








V. Batson=s
Applicability to Jury Shuffle

In Appellant=s
seventh point he contends that the trial court violated the federal equal
protection clause by overruling his Batson v. Kentucky objection
to the State=s venire panel shuffle request. 

A. Applicable Law

Article 35.11 of the Texas Code of Criminal
Procedure provides the defendant with a right to a shuffle of the jury panel.  See Tex.
Code Crim. Proc. Ann. art. 35.11 (Vernon Supp. 2007); Ex parte Daigle,
848 S.W.2d 691, 692 (Tex. Crim. App. 1993). 
A request is timely if made prior to commencement of voir dire.  Latham v. State, 656 S.W.2d 478, 479
(Tex. Crim. App. 1983). 

In Batson v. Kentucky, the
Supreme Court held that racial discrimination in the use of peremptory
challenges denies a defendant the equal protection of the law guaranteed by the
U.S. Constitution.  Batson v. Kentucky,
476 U.S. 79, 106 S. Ct. 1712 (1986).  But
the Court of Criminal Appeals has never held that Batson applies to jury
shuffles.  See Ladd v. State, 3
S.W.3d 547, 563 n.9 (Tex. Crim. App. 1999) (stating in a footnote that it does
not endorse the view that Batson extends to jury shuffles), cert.
denied, 529 U.S. 1070 (2000). 

B. Analysis 








In the case before us, the State requested a
shuffle of the panel after the venire was assembled.  Appellant objected to the shuffle on the
basis of Batson v. Kentucky, arguing that the motive for the shuffle was
not race-neutral due to the disproportionate number of minorities in the first
seventy-five panel members.  The trial
court overruled the objection.  








Despite Appellant=s
attempt to persuade this court that Batson is applicable to jury
shuffles, we have not found, nor has Appellant shown us, any case law that
directly applies Batson to a jury shuffle.  In contrast, the court of criminal appeals
averred in Ladd, albiet in dicta, that it does not endorse the view that
Batson applies to jury shuffles.  See
id.; see also Ashorn v. State, 77 S.W.3d 405, 408 (Tex. App.CHouston
[1st Dist.] 2002, pet. ref=d)
(stating that the court of criminal appeals has declared that its footnotes are
dicta).  Appellant attempts to support
his position by directing us to Miller-El v. Dretke, 545 U.S. 231, 125
S. Ct. 2317 (2005), in which the United States Supreme Court held that the
prosecutor=s jury shuffle request was a
clue indicating his intent to use his peremptory challenges in a discriminatory
fashion.  Although this case demonstrates
that the prosecution=s use of a jury shuffle may be
examined in determining whether broader patterns of discriminatory practice are
used during jury selection, the court did not definitively hold that a Batson
challenge extends beyond peremptory challenges and into the realm of jury shuffles.  Id. Therefore, we will not make such a
determination either.  Because Appellant
asserts a position that is not supported by precedent, we overrule his seventh
point.

VI. Admissibility of Witness=s
Inconsistent Statements

In Appellant=s
fourth, fifth, and sixth points he contends that the trial court violated the
Confrontation Clause and Texas Rules of Evidence 613(b) by excluding prior
inconsistent statements made by Sarah Wamsley, Rick and Suzanna=s
daughter, that would have impeached her testimony and corrected the false
impressions she created on direct examination. 

A. Applicable Law

A trial court=s
evidentiary rulings are reviewed under an abuse of discretion standard.  Weatherred v. State, 15 S.W.3d 540, 542
(Tex. Crim. App. 2000).  The reviewing
court should not reverse the trial court if its ruling was within the zone of
reasonable disagreement.  Montgomery,
810 S.W.2d at 391.  








The constitutional right of confrontation provides
that the accused shall enjoy the right . . . to be confronted with the
witnesses against him.  U.S. Const. amend. VI.  A primary interest secured by the
Confrontation Clause is the right of cross‑examination.  Lopez v. State, 18 S.W.3d 220, 222
(Tex. Crim. App. 2000).  It does not
follow, of course, that the Confrontation Clause of the Sixth Amendment
prevents a trial judge from imposing any limits on defense counsel=s
inquiry into the potential bias of a prosecution witness.  Delamora v. State, 128 S.W.3d 344, 364
(Tex. App.CAustin 2004, pet. ref=d).  On the contrary, trial judges retain wide
latitude insofar as the Confrontation Clause is concerned to impose reasonable
limits on such cross‑examination based on concerns about, among other
things, harassment, prejudice, confusion of the issues, the witness=s
safety, or interrogation that is repetitive or only marginally relevant.  Lopez, 18 S.W.3d at 222.  The Confrontation Clause guarantees an
opportunity for effective cross‑examination, not cross‑examination
that is effective in whatever way, and to whatever extent, the defense might
wish. Delamora, 128 S.W.3d at 364.








In general, witnesses may not be impeached
regarding collateral matters.  Ramirez
v. State, 802 S.W.2d 674, 676 (Tex. Crim. App. 1990).  A collateral matter is one which seeks only
to test a witness=s general credibility or relates
to facts irrelevant to issues at trial.  Keller v. State, 662 S.W.2d 362, 365 (Tex.
Crim. App. 1984); Cortez v. State, No. 2-05-147-CR, 2006 WL 1563275, at
*11 (Tex. App.CFort Worth June 8, 2006, pet.
ref=d) (mem.
op.) (not designated for publication). 
The test as to whether a matter is collateral is whether the cross‑examining
party would be entitled to prove it as a part of his case tending to establish
his plea.  Bates v. State, 587
S.W.2d 121, 133 (Tex. Crim. App. 1979). 
When a witness leaves a false impression concerning a matter relating to
his or her credibility, the opposing party is allowed to correct that false
impression.  Ramirez, 802 S.W.2d
at 676.  However, this exception does not
apply when the false impression is created by cross-examination.  See Shipman v. State, 604 S.W.2d 182,
183-84 (Tex. Crim. App. 1980). 

B. Applicable Facts

On direct examination, Sarah testified that her
adolescence was difficult for both herself and her parents because she was a Awild
child.@  She received both medication and therapy for
her psychological problems, but stated that she did not did not work through
all of her issues until about a year after she left Todd Cleveland, the father
of her child.  She claimed that her
parents were supportive throughout this time. 


On cross-examination, Sarah testified that while
she and her parents had arguments, they were still supportive of her.  Appellant also asked Sarah whether her mother
had ever talked to her about getting a divorce; Sarah stated that while her
parents had their difficulties, they had not discussed any plans for divorce
with her.  Upon Appellant=s
inquiry, Sarah testified that she had voluntarily admitted herself into
Millwood Hospital because of the troubles she was having with the father of her
child. 








During cross-examination of Sarah, Appellant
sought to introduce prior inconsistent statements to impeach Sarah=s
testimony; however, the trial court sustained the State=s
objections on relevance grounds.  Appellant
asserted that the evidence was relevant because Sarah=s
testimony created the false impressions that her parents were Aalways@
supportive of her, that the sole reason she entered therapy was because of the
ongoing problems she had with the father of her child, and that she did not
know of any plans her parents may have had for divorce.  The trial court permitted Appellant to ask
Sarah questions outside the jury=s
presence as an offer of proof under Texas Rule of Evidence 103.[7]


C. Analysis








After reviewing the record, we determine that the
trial court properly limited Appellant=s
cross-examination of Sarah to relevant matters. 
The issues that Appellant sought to cross-examine Sarah on were
collateral, and therefore the general rule that a witness may not be impeached
regarding collateral matters applies.  See Ramirez, 802 S.W.2d at 676.  Whether the Wamsleys were supportive of
Sarah, whether Sarah knew of any plans her parents may have had to divorce, and
the reason Sarah entered therapy was not evidence that Appellant could have
relied on in his case-in-chief to show that he had not committed the murders of
his parents.  See id. 

Appellant attempts to show that even if these
issues were collateral, the trial court should have permitted him to
cross-examine Sarah because her testimony created false impressions regarding
her credibility that needed to be corrected. 
He relies on the exception that if a witness leaves a false
impression  concerning a matter relating
to his or her credibility, then the opposing party is allowed to correct that
false impression.  See id.  Specifically, Appellant argues that Sarah=s
testimony created the false impression that (1) the Wamsleys were always
supportive of her, (2) that she did not know of her parent=s plans
for divorce, and (3) that all of Sarah=s
problems were related to a bad relationship with Todd Cleveland.  He contends that he should have been
permitted to cross-examine Sarah with statements she made while in therapy that
would have corrected these false impressions. 








We first evaluate Appellant=s
argument that Sarah=s testimony created the false
impression that her parents were always supportive of her.  The issue of her parent=s
support arose when the prosecutor asked Sarah whether her parents had been
supportive of her while she underwent therapy for psychological problems.  When asked whether her parents had been
supportive during this time Sarah answered Ayes@; in
response to the question of whether they had continued to be supportive of her,
Sarah answered, Aalways.@








After examining cases in which the false
impression exception applied, we determine that the exception is not applicable
here.  The testimony before us today
differs greatly from situations in which the Afalse
impression@ exception is typically
applied.  For instance, in Ex parte
Carter, 621 S.W.2d 786, 788 (Tex. Crim. App. 1981), the appellant=s direct
testimony conveyed the distinct impression that his two prior convictions and
two prior arrests constituted his entire Arecord,@
including convictions and arrests.  The
tenor of appellant=s direct testimony was that,
except for those four instances, his Arecord@ was
clean.  In contrast, the appellant had
been arrested and booked over thirteen times. 
The court held that it was permissible to impeach the appellant with
evidence of these additional arrests because the appellant had given a false
impression of his record.  Carter,
621 S.W.2d at 788.  In that case, the
only way that the jury was going to learn that the appellant=s
testimony was incorrect was if the court allowed the State to impeach the
appellant.  In contrast, our review of
the record shows that although Sarah stated on direct that her parents were
always supportive of her, this testimony was balanced by her testimony on
cross-examination in which she stated that even though she and her parents had
arguments, her parents still supported her. Based on the combination of her
testimony on direct and cross-examination, the jury was provided with an
impression that while Sarah=s
relationship with her parents was not without disapproval and trouble at
different times, overall, Sarah=s
parents supported her.  Thus, we conclude
that the jury was not left with a false impression of Sarah=s
relationship with her parents that needed to be corrected by additional
cross-examination. 








In regard to the second and third
statements,  we determine that even if
Sarah=s
testimony created the false impressions that she did not know of her parent=s plans
for divorce and that all of her problems were related to a bad relationship
with Todd Cleveland, the trial court properly denied cross-examination on these
issues.  Our review of the record shows
that neither of these Afalse impressions@ were
created by Sarah=s testimony on direct
examination; in contrast, it was Appellant who raised them during
cross-examination.  It was Appellant who
asked Sarah if the only reason she voluntarily admitted herself into treatment
was because of her problems with her child=s
father.  Similarly, it was Appellant who
raised the issue of whether Sarah knew of any plans her parents may have had to
divorce.  Because a party may not rely on
its own questioning on cross-examination to contradict a witness and get into
evidence collateral matters which would otherwise be inadmissible, we determine
that the trial court did not abuse its discretion in prohibiting Appellant from
impeaching Sarah on these collateral issues. 
See Shipman, 604 S.W.2d at 185. 


Furthermore, even if the trial court had
permitted Appellant to cross-examine Sarah on any of these issues, it would not
have revealed bias or motivation to testify falsely on Sarah=s
behalf.  Appellant desired to
cross-examine Sarah with prior inconsistent statements to impeach her
credibility.  Specifically, he claimed
that the inconsistency of her statements would demonstrate that Sarah had a
motive to testify falsely because she was a named beneficiary in her parent=s will,
and that her inheritance would be greater if she was the sole beneficiary.  However, even without cross-examination on
the statements Sarah made in therapy, Appellant had already been allowed to
establish that Sarah had gained financially from her parent=s death
as she was a named beneficiary of her parent=s
estate.  Any possible bias or motive
Sarah would have to testify falsely had already been clearly presented to the
jury.  Therefore, Appellant had already
been afforded the opportunity for a thorough and effective cross-examination,
and any additional cross-examination was unnecessary.  See Lopez, 18 S.W.3d at 222.  








In conclusion, we hold that the trial court did
not abuse its discretion in limiting Appellant=s
cross-examination of Sarah when he had been afforded the opportunity for
effective cross-examination.  See id.  Accordingly, we overrule Appellant=s
fourth, fifth, and sixth points.

VII. Motion to SuppressCTiming
of Execution of Search Warrant 

In Appellant=s eighth
point he argues that the trial court erred by failing to suppress blood and DNA
evidence because the repeated search of his vehicle went beyond the temporal
scope and authority of the warrant and was therefore unlawful.  In Appellant=s
eleventh point he contends that the warrantless seizure of his automobile was a
violation of the Fourth Amendment.

A. Standard of Review








We review a trial court=s ruling
on a motion to suppress evidence under a bifurcated standard of review.  Amador v. State, 221 S.W.3d 666, 673
(Tex. Crim. App. 2007); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim.
App. 1997).  In reviewing the trial court=s
decision, we do not engage in our own factual review.  Romero v. State, 800 S.W.2d 539, 543
(Tex. Crim. App. 1990); Best v. State, 118 S.W.3d 857, 861 (Tex. App.CFort
Worth 2003, no pet.).  The trial judge is
the sole trier of fact and judge of the credibility of the witnesses and the
weight to be given their testimony.  Wiede
v. State, 214 S.W.3d 17, 24-25 (Tex. Crim. App. 2007); State v. Ross,
32 S.W.3d 853, 855 (Tex. Crim. App. 2000), modified on other grounds by
State v. Cullen, 195 S.W.3d 696 (Tex. Crim. App. 2006).  Therefore, we give almost total deference to
the trial court=s rulings on (1) questions of
historical fact, even if the trial court=s
determination of those facts was not based on an evaluation of credibility and
demeanor, and (2) application‑of‑law‑to‑fact questions
that turn on an evaluation of credibility and demeanor.  Amador, 221 S.W.3d at 673; Montanez
v. State, 195 S.W.3d 101, 108-09 (Tex. Crim. App. 2006); Johnson v.
State, 68 S.W.3d 644, 652‑53 (Tex. Crim. App. 2002).  But when application-of-law-to-fact questions
do not turn on the credibility and demeanor of the witnesses, we review the
trial court=s rulings on those questions de
novo.  Amador, 221 S.W.3d at 673; Estrada
v. State, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); Johnson, 68
S.W.3d at 652‑53.








Stated another way, when reviewing the trial
court=s ruling
on a motion to suppress, we must view the evidence in the light most favorable
to the trial court=s ruling.  Wiede, 214 S.W.3d at 24; State v.
Kelly, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).  When the trial court makes explicit fact
findings, we determine whether the evidence, when viewed in the light most
favorable to the trial court=s ruling,
supports those fact findings.  Kelly,
204 S.W.3d at 818-19.  We then review the
trial court=s legal ruling de novo unless
its explicit fact findings that are supported by the record are also
dispositive of the legal ruling.  Id.
at 819.  We must uphold the trial court=s ruling
if it is supported by the record and correct under any theory of law applicable
to the case even if the trial court gave the wrong reason for its ruling.  State v. Stevens, 235 S.W.3d 736,
740  (Tex. Crim. App. 2007); Armendariz
v. State, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), cert. denied,
541 U.S. 974 (2004).

B. Applicable Law

The Fourth Amendment protects against
unreasonable searches and seizures.  U.S. Const. amend. IV.  Generally, a search conducted without a
warrant is considered per se unreasonable. 
McGee v. State, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003).  But there is an exception for vehiclesCa
warrantless search of a vehicle is reasonable if law enforcement officials have
probable cause to believe that the vehicle contains evidence of a crime.  Chambers v. Maroney, 399 U.S. 42, 48‑49,
90 S. Ct. 1975, 1980-81 (1970); Wiede v. State, 214 S.W.3d 17, 24 (Tex.
Crim. App. 2007); Amos v. State, 819 S.W.2d 156, 160‑61 (Tex.
Crim. App. 1991).  Less rigorous warrant
requirements govern vehicles because the expectation of privacy with respect to
one=s
automobile is significantly less than that relating to one=s home
or office.  Wiede, 214 S.W.3d at
24. 








There is no requirement that the warrantless
search of a vehicle occur contemporaneously with its lawful seizure.  U.S. v. Johns, 469 U.S. 478, 484, 105
S. Ct. 881, 885 (1985).  Once probable
cause to believe that a car contains evidence of a crime is established, the
officers can conduct a valid search of the car immediately, without a
warrant.  Amos, 819 S.W.2d at 161.
 There is no requirement of
exigent circumstances to justify a warrantless search of a vehicle.  Johns, 469 U.S. at 484, 105 S. Ct. at 885;
State v. Guzman, 959 S.W.2d 631, 634 (Tex. Crim. App. 1998).       

Probable cause exists when, under the totality of
the circumstances, there is a Afair
probability@ that contraband or evidence of
a crime will be found in the specified location.  Rodriguez v. State, 232 S.W.3d 55, 60
(Tex. Crim. App. 2007).  When the facts
and circumstances within the knowledge of the officer on the scene and of which
he has reasonably trustworthy information would lead a man of reasonable
caution and prudence to believe that he will find the instrumentality of a
crime or evidence pertaining to a crime, probable cause exists.  Barber v. State, 611 S.W.2d 67, 68
(Tex. Crim. App. 1981).  The sum of the
information known to the cooperating officers at the time of a search is to be
considered in determining whether there was sufficient probable cause. Woodward
v. State, 668 S.W.2d 337, 344 (Tex. Crim. App. 1982).  

C. Analysis








Appellant contends that the warrantless seizure
of his vehicle and its subsequent search violated the Fourth Amendment.  Specifically, he argues that the searches
conducted on December 17 and 18, 2003, and February 5, 2004, were illegal
because the police conducted the searches under the authority of a warrant that
was no longer valid under articles 18.06(a) and 18.07 of the Texas Code of
Criminal Procedure.[8]

1. Seizure and Search of Appellant=s Car








On December 12, 2003, Appellant signed a consent
to search his vehicle, a 1998 Ford Mustang. 
Officer Mark Kelly searched the vehicle pursuant to consent and
recovered a latex glove from the backseat floorboard.  Appellant then withdrew his consent.  Mansfield police secured the vehicle and held
it in their impound lot until they could obtain a search warrant.  Police obtained a warrant by 7:00 p.m. on
that day.  The next day, December 13, Tom
Ekis of Forensic Consultants conducted Luminol testing on the interior of the
vehicle, and various cuttings were taken from the vehicle.  On December 17, Officer Mark Kelly conducted
additional Luminol testing on the Mustang=s
interior and recommended that certain pieces be removed from the vehicle.  The following day, December 18, police
removed cuttings from the front passenger headrest cover, the front passenger
seat=s back
cover, the trunk fabric cover, and the back seat=s cover
on the passenger side.  On February 5,
2004, the police removed additional items from the Mustang, including the back
side of the front passenger seat, the foam seat bottom from the front passenger
seat, the carpet below the front passenger seat, and a piece of cotton that was
lying under the front passenger seat. 

2. Appellant=s Motion
to Suppress and the Trial Court=s
Findings of Facts

At a pretrial hearing on his motion to suppress,
Appellant argued that the police searched the vehicle repeatedly after the
temporal scope and authority of the warrant had expired when they entered his
vehicle on December 17 and 18, 2003, and February 5, 2004.  The trial court overruled Appellant=s motion
to suppress and entered findings of fact. 

The trial court found that Detective Ralph
Standefer was the lead detective in the investigation of the Wamsleys=
murders.  He was on the scene on December
12, 2003, when Appellant arrived.  The
court found that upon the detective=s
request, Appellant voluntarily followed him back to the Mansfield Police
Department to talk, where he voluntarily signed a form giving consent to search
his vehicle.  While searching Appellant=s car,
they found a white latex glove as well as several receipts; Appellant
immediately withdrew his consent to search. 
The trial court found that Detective Standefer kept Appellant=s
vehicle after he withdrew his consent to search, and that 








at the time the vehicle in question was secured
at the Mansfield Police Department to await the signing of a search warrant
that [Appellant] had become a suspect, that the vehicle was registered to the
victims of the offense, Rick Wamsley and Suzanna Wamsley, that the vehicle had
been missing from the scene of the offense and that it was then believed that
since it was missing from the victims=
residence that the actor(s) may have driven the vehicle from the residence
after the offense and may contain blood evidence.

The trial court also found under the circumstances it was reasonable
to secure the vehicle to await the signing of a search warrant.  It further found that the facts recited in
the affidavit gave the affiant probable cause for his beliefs that the vehicle
contained evidence, and were sufficient for the magistrate to find that the
affiant had probable cause to issue the warrant.  The warrant was issued on December 12, 2003,
and when it was executed on December 13, the presence of blood was detected by
Luminol testing.  The court further found
that the subsequent entries of the car on December 17 and 18, 2003 and February
5, 2004 were not new searches of the vehicle, but entries made for the purpose
of removing and testing what had already been detected and seized by the police
on December 13, 2003.

3. Harm Analysis

Assuming without deciding that the trial court
erred in overruling Appellant=s motion
to suppress the evidence seized from Appellant=s
vehicle, we determine that any error was harmless. 








The harm analysis for the erroneous admission of
evidence obtained in violation of the Fourth Amendment must be conducted under
Rule 44.2(a)=s constitutional standard.  Tex. R.
App. P. 44.2(a); Hernandez v. State, 60 S.W.3d 106, 108 (Tex.
Crim. App. 2001).  The question is
whether the trial court=s denial of Appellant=s motion
to suppress and admission of the evidence was harmless beyond a reasonable
doubt.  See Williams v. State, 958
S.W.2d 186, 194 (Tex. Crim. App. 1997). 
In applying the Aharmless error@ test,
our primary question is whether there is a Areasonable
possibility@ that the error might have
contributed to the conviction.  Mosley
v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998), cert. denied,
526 U.S. 1070 (1999).








Our harmless error analysis should not focus on
the propriety of the outcome of the trial; instead, we should calculate as much
as possible the probable impact on the jury in light of the existence of other
evidence.  Wesbrook v. State, 29
S.W.3d 103, 119 (Tex. Crim. App. 2000), cert. denied, 532 U.S. 944
(2001).  We consider the source and
nature of the error, the extent that it was emphasized by the State, its
probable collateral implications, the weight a juror would probably place on
the error, and whether declaring it harmless would be likely to encourage the
State to repeat it with impunity.  Harris
v. State, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989).  This requires us to evaluate the entire
record in a neutral, impartial, and even‑handed manner, not Ain the
light most favorable to the prosecution.@  Id. at 586.

A review of the record shows that Carolyn Van
Winkle, who is employed by the DNA section of the Tarrant County Medical
Examiner=s crime
laboratory, testified at trial that she examined cuttings of upholstery and
carpet taken from Appellant=s
Mustang and identified some faint, diffuse stains.  Some of the stains tested positive with a
blood reagent, and she was able to identify those stains as human blood.  Van Winkle also testified that she was able
to get a partial DNA profile of Chelsea Richardson from a couple of bloodstains
on the upholstery sample, and was unable to exclude Chelsea as the source of
DNA recovered from the back seat cover. 
On cross-examination, Van Winkle agreed with Appellant=s
attorney that no sample taken from the Mustang was consistent with Rick=s or
Suzanna=s DNA
profile.  








In evaluating whether the admission of the
evidence harmed Appellant, we consider the fact that Appellant=s DNA
did not appear in any of the seized evidence, nor were any of the samples
recovered from the Mustang consistent with Rick=s or
Suzanna=s DNA
profile.[9]  In fact, the inadequacy of the DNA evidence
was actually pointed out by Appellant=s
counsel during both opening statements and closing arguments when his counsel
told the jury that the State would not be able to link Appellant to the murders
through DNA evidence.  Appellant=s
counsel specifically stated during opening statements that the search of the
car did not result in Aevidence of any kind, of any
type of blood evidence or DNA evidence to tie [Appellant] to the deaths of Rick
and Suzy Wamsley.@ 
Appellant=s counsel again emphasized the
lack of DNA evidence to the jury during closing arguments when he stated the
following:

[W]hat the DNA tells you in this case isn=t much,
and it doesn=t fill  the gaps in the evidence . . . It
doesn=t tell
you that [Appellant] had anything to do with the physical evidence or what
occurred with Mr. and Mrs. Wamsley, and it doesn=t put
any of their blood standards or their samples out in the car, out of his car
. . . .








Furthermore, the State=s
emphasis on the blood and DNA evidence recovered from the search of the Mustang
was slight.  During closing arguments,
the State mentioned that the swabs and cuttings from the Mustang were positive
for blood, and stated A[t]hat=s an
awful lot of areas in an automobile for there to be positive traces of blood in
a car.@  








Moreover, the strength of the State=s case
linking Appellant to the murders was not based on the DNA and blood evidence
derived from the car. Rather, the State=s case
hinged on the testimony of Susan Toledano, an accomplice in the Wamsleys=
murders.  Toledano testified that she,
Chelsea, and Appellant murdered Rick and Suzanna during the early morning hours
of December 11, 2003.  In her testimony,
she related how the plans to harm the Wamsleys developed.  Sometime during October 2003, Toledano,
Chelsea, and Appellant began their initial discussions of how they could injure
the Rick and Suzanna.  Their ideas
included tampering with the brakes in Rick=s car
and putting balloons filled with Drano into the gas tanks of their cars.  At some point during the development of their
plans, Hilario Cardenas, a friend of Chelsea and Appellant, provided them with
a revolver.  In the latter part of the
fall, Appellant contacted Ruth Brustrom, a friend of Chelsea=s
family, and asked her if he, Chelsea, and Toledano could practice shooting on
her property in Burleson.[10]  Each of the three took turns shooting the gun
into a pond on Brustrom=s property.  Soon after, they came up with another plan to
harm the Wamsleys.  In November 2003,
Toledano and Appellant attempted to kill the Wamsleys by shooting the gas tank
of the Jeep they were riding in, in hopes that the car would blow up.  Eventually, their plan to harm the Wamsleys
was effectuated when they shot and stabbed the Wamsleys during the early
morning hours on December 11.  Toledano
testified that immediately after the murders Chelsea used Toledano=s cell
phone to call her friend Jeremy. 

Toledano=s entire
testimony was corroborated by several other witnesses who testified at
trial.  Brustrom, a longtime friend of
Chelsea=s
family, testified that during the fall of 2003 Appellant had called her asking
if he and Toledano could visit her property in Burleson because Toledano wanted
to learn how to shoot a gun.  Sometime after
Halloween, but before the Wamsleys were murdered, Appellant, Toledano, and
Chelsea went to her property in Burleson. 
Brustrom testified that after Appellant retrieved a gun from the trunk
of the car, he loaded it and they all went down to the pond and took turns
firing the gun. 

Sarah Wamsley testified that on November 9, 2003,
she and her parents were returning from Joshua, Texas, where they had gone to
ride their horses. While driving along I-35, she heard a boom and thought that
a rock had struck their Jeep.  Police
responded to Suzanna=s 911 call and discovered a hole
in the left rear panel of the Jeep.  The
police recovered a bullet from the Jeep.








Keith Cowand, a neighbor of the Wamsleys,
testified that on the night of December 11, 2003 he was awakened by something
that sounded like gunshots.  He stated
that he looked at his clock and it was 3:23 a.m.  Jeremy Lavender also testified that during
the early morning hours of December 11 he received a series of phone calls from
Chelsea to his cell phone and land line. 
Chelsea wanted him to be her alibi, but would not tell him what kind of
trouble she was in or why she needed an alibi when he asked.[11]  The State submitted into evidence Jeremy=s
telephone records, which showed that on December 11 Jeremy received six phone
calls from Chelsea between 3:42 a.m. and 4:02 a.m. 








The jury also heard the testimony of Ron Van
Fleet, a firearms and toolmark examiner for the Fort Worth Police Department
Crime Laboratory, who testified that he compared a single bullet removed from
Brustrom=s pond
with bullets recovered from the Wamsleys= dining
room, the headboard in their master bedroom, the soffit area outside the master
bedroom, Suzanna=s body, and Rick=s Jeep.[12]  After comparing all of the bullets, Van Fleet
testified that all of the bullets were fired from the same weapon.

It is clear from the record that Appellant=s
conviction for his parent=s murders was based on the
cumulative testimony of these witnesses and not on evidence recovered from the
search of his car.  Therefore, in light
of all the other evidence presented at trial connecting Appellant to the
murders, in addition to the State=s lack
of emphasis on the evidence and Appellant=s
ability to discredit it at trial, we hold that the trial court=s
admission of the blood and DNA evidence recovered from the search of his
Mustang was harmless beyond a reasonable doubt because it did not contribute to
Appellant=s conviction or punishment.  See Tex.
R. App. P. 44.2(b); see Wesbrook, 29 S.W.3d at 119.  Accordingly, we overrule Appellant=s eighth
and eleventh points.

VIII. Motion to SuppressCProbable
Cause








In Appellant=s ninth
point he argues that he was subjected to an unlawful search and seizure of his
vehicle because the search warrant was not supported by probable cause.  In his tenth point, he asserts that the
affidavit supporting the search warrant for his vehicle failed to establish
probable cause and thus the search violated the Fourth Amendment because the
affiant omitted material information with reckless disregard for the truth. 

A. Applicable Law

A search warrant may not be issued unless
supported by a sworn affidavit that sets forth sufficient facts to establish
probable cause: (1) that a specific offense has been committed, (2) that the
specifically described property or items that are to be searched for or seized
constitute evidence of that offense or evidence that a particular person
committed that offense, and (3) that the property or items constituting
evidence to be searched for or seized are located at or on the particular person,
place, or thing to be searched.  See Tex. Code Crim. Proc. Ann. art.
18.01(c). 








The cornerstone of the Fourth Amendment is that a
magistrate shall not issue a search warrant without first finding Aprobable
cause@ that a
particular item will be found in a particular location.  Rodriguez, 232 S.W.3d at 60.  When reviewing a magistrate=s
decision to issue a warrant, trial and appellate courts apply a highly
deferential standard in keeping with the constitutional preference for a
warrant.  Id.  Thus, when an appellate court reviews the
sufficiency of an affidavit for a search warrant, the reviewing court is
limited to the four corners of the affidavit. 
Hankins v. State, 132 S.W.3d 380, 388 (Tex. Crim. App.), cert.
denied, 543 U.S. 944 (2004); Jones v. State, 833 S.W.2d 118, 123
(Tex. Crim. App. 1992), cert. denied, 507 U.S. 921 (1993). 

Furthermore, as reviewing courts, we are obliged
to defer to the magistrate and uphold his determination based upon all
reasonable and commonsense inferences and conclusions that the affidavit facts
support. Rodriguez, 232 S.W.3d at 64. 
We must defer to the magistrate=s
finding of probable cause if the affidavit demonstrates a substantial basis for
his conclusion.  Id.  It is
not necessary to delve into all of the facts that were omitted by the affiant,
facts that could have been included in the affidavit, or contrary inferences
that could have been made by the magistrate. 
Id.  Although in a
particular case it may not be easy to determine when an affidavit demonstrates
the existence of probable cause, the resolution of doubtful or marginal cases
in this area should be largely determined by the preference to be accorded to
warrants.  Id. at 59.  Thus, even in close cases we give great
deference to a magistrate=s determination of probable
cause to encourage police officers to use the warrant process rather than
making a warrantless search and later attempting to justify their actions by
invoking some exception to the warrant requirement.  Id. at 59-60. 

 

 








B. Affidavit

With these general principles in mind, we now
turn to the affidavit in this case.  The
affidavit stated that a 1998 Ford Mustang had been secured by the Mansfield
police department.  The car was
registered to murder victims Rick and Suzanna Wamsley and was controlled by
Appellant, the suspected party.  The
affiant stated that he believed that the suspected party had possession of and
was concealing within the vehicle (a) shoes consistent with imprints found at
the crime scene, (b) clothing with blood stains consistent with those likely
worn by an individual responsible for the assaults, and (c) blood in sufficient
amounts to recover samples for DNA typing. 








The affiant asserted that he had probable cause
for the warrant because of the following facts: on December 11, 2003, Mansfield
police officers responded to a 911 call where they discovered the bodies of
Rick and Suzanna who appeared to have been murdered.  Both of the victims had trauma about their
bodies, and large quantities of blood was found at the crime scene.  Crime Scene Personnel also found blood
stained shoe prints inside the Wamsleys= home,
and evidence was collected on the shoe prints. 
The affidavit also stated that Appellant met with investigators at the
police department and advised them that he had possession of his parents= 1998
Ford Mustang and that it was parked outside. 
Through the investigation the police learned that the vehicle was
registered to Rick and Suzanna and had been missing from the crime scene.  The affiant stated that it was believed that
the actor(s) responsible for the Wamsleys= murders
may have driven the vehicle from the crime scene after the murders, and that
the car may now contain blood evidence. 

C. Analysis

The primary issue is whether the search warrant
was supported by probable cause. 
Appellant first contends that the warrant failed to establish probable
cause that he had committed the offense and that evidence would be found in the
vehicle.  We disagree.  Although the affidavit did not set forth
facts showing that the search would yield evidence that Appellant committed the
offense, the affidavit clearly complied with Texas Code of Criminal Procedure
article 18.01(c).  In addition to showing
that the affiant had probable cause to believe that a specific offense had been
committed, article 18.01(c) only requires that the affidavit set forth facts
that the specifically Adescribed property or item to be
searched or seized constitute either evidence of an offense or evidence
that a particular person committed that offense,@ and
that the items constituting evidence are located in the particular thing to be
searched.  See Tex. Code Crim. Proc. Ann. art.
18.01(c) (emphasis added).  








Here, the affidavit set forth sufficient facts to
show that the affiant had probable cause to believe that two murders had
been committed because Rick=s and
Suzanna=s bodies
had been discovered at their home.  The
crime scene contained large quantities of blood, and a bloody footprint was
found inside the residence.  Thus, it may
reasonably be inferred from these facts that the murderer or murderers got
blood on themselves, their clothing, or shoes at some point while committing
the murders.  The affidavit also
states that a 1998 Ford Mustang, registered to Rick and Suzanna, was missing
from the murder scene.  It is a
reasonable inference from this fact that the Wamsleys= missing
car may have been used by the murderer or murderers as a method to flee the
scene, and, therefore, that it may contain blood evidence.  Thus, the facts contained in the affidavit,
and all reasonable inferences derived from them, establish probable cause that
a crime had been committed, that the vehicle to be searched constituted
evidence of the crime, and that there was a fair probability that items
constituting evidence would be found in the car.  See Tex.
Code Crim. Proc. Ann. art. 18.01(c); Rodriguez, 232 S.W.3d at
64.  Therefore, because the affidavit
clearly set forth facts to satisfy each element of article 18.01(c), we hold
that Appellant=s contention is without
merit.  








Appellant further contends that probable cause
was not established because the affiant purposefully omitted the fact that the
police did not discover any signs of blood during their initial search of the
vehicle.  In order for an affiant=s
omission to be a basis to suppress a warrant, the appellant must establish by a
preponderance of the evidence that the omission was made knowingly,
intentionally, or with reckless disregard for the truth in an attempt to
mislead the magistrate.  Darby v.
State, 145 S.W.3d 714, 722 (Tex. App.CFort
Worth 2004, pet. ref=d).  The omission of a material fact must affect
the finding of probable cause in support of the issuance of the warrant in
order for a warrant to be rendered invalid by such omission.  See id. 

Contrary to Appellant=s
contention, we determine that the omitted fact would not affect the finding of
probable cause in support of the issuance of the warrant.  In the affidavit, the affiant specifically
stated that it was his belief that Ablood in
sufficient amounts to recover samples for DNA typing@ would
be found in the car.  Even if the affiant
had included the omitted information that an initial search had not resulted in
the detection of blood, a magistrate could reasonably conclude that merely
because obvious signs of blood were not detected, this did not necessarily mean
that blood was not present.  Indeed, the
magistrate could have reasonably concluded that the police wanted to test the
vehicle with chemicals, such as Luminol, that can reveal the presence of blood
not visible to the naked eye but sufficient to conduct DNA typing upon.  Thus, even if the information had been
included, the magistrate could still have found probable cause to issue the
warrant.  Therefore, we conclude that the
affidavit was not rendered invalid by the omission of this fact.  See id. 








In any event, even if the trial court did err in
denying Appellant=s motion to suppress the
evidence seized from the Mustang, any error was harmless.  We have already determined in our discussion
of the previous point that the evidence derived from the search of the vehicle
did not contribute to Appellant=s
conviction or punishment. 

Because we determine that the facts actually in
the affidavit, combined with all reasonable inferences that might flow from
those facts, establish a Afair probability@ that
evidence of the murders would be found in the vehicle, we hold that the warrant
was supported by probable cause.  See
Rodriguez, 232 S.W.3d at 60. 
Accordingly, we overrule Appellant=s ninth
and tenth points.

IX. Conclusion 

Having overruled all of Appellant=s
points, we affirm the trial court=s
judgment. 

 

BOB MCCOY

JUSTICE

 

PANEL B:   LIVINGSTON, WALKER,
and MCCOY, JJ.

 

LIVINGSTON, J. concurs without opinion.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED: March 13, 2008











[1]See Tex. R. App. P. 47.4.





[2]Article 35.03 governs the
hearing of juror excuses in capital murder cases.  August v. State, No. 2-04-117-CR, 2005
WL 1477783 *5 (Tex. App.CFort Worth June 23, 2005,
pet. ref=d) (mem. op.) (not
designated for publication).

 





[3]The trial court believed
that it was too late for McCrary to claim his exemption; however, this belief
was incorrect because under article 35.03, the trial court retains the
authority to excuse a venireperson up until the time the entire jury has been
empaneled and sworn.  See Rousseau,
855 S.W.2d at 676-77. 





[4]Appellant initially
attempted to challenge juror McCrary for cause due to McCrary=s inability to consider
the entire range of punishment on the lesser offense of murder, and because
McCrary believed that by finding Appellant guilty as a party to the offense of
capital murder he would have already answered special issue two in the affirmative.  Similarly, at the conclusion of individual
voir dire of juror Zimmerman, Appellant challenged her for cause because she
believed that by finding Appellant guilty as a party to the offense of capital
murder she would have already answered special issue two in the
affirmative.  The trial court denied both
challenges. 





[5]Generally, when
prospective jurors are initially summoned, they are assembled in a general jury
pool or general assembly.  Jasper,
61 S.W.3d at 422‑23.  Members of
the general assembly are qualified on their ability to serve, and exemptions
and excuses are heard and ruled on by the judge presiding over the general
assembly.  Tex. Gov=t
Code Ann. ' 62.016 (Vernon
2005); Jasper, 61 S.W.3d at 423. 
Prospective jurors who are not disqualified, exempt, or excused are
divided into trial panels and sent to the individual courts trying the cases.  Jasper, 61 S.W.3d at 423.  At that point, attorney voir dire will result
in the jury that will ultimately hear the case. 
Id.  

 





[6]Because more than one
hundred jurors were called for service the week of Appellant=s trial, the decision to
grant a special venire was within the discretion of the trial court.  See Tex.
Code Crim. Proc. Ann. art. 34.01 (Vernon Supp. 2007); Barnes v. State,
876 S.W.2d 316, 324 (Tex. Crim. App. 1994).

 





[7]In Appellant=s offer of proof,
Appellant questioned Sarah regarding statements she made to her therapist while
undergoing psychological treatment at Millwood Hospital.  Each of the questions addressed the
difficulties that Sarah had with her parents, how they made her feel, as well
as the problems that Rick and Suzanna had with one another.  Sarah either denied or did not recall making
any of the statements Appellant questioned her on.





[8]Articles 18.06(a) and
18.07 provide that a search warrant must be executed within three days from the
time of its issuance.  See Tex. Code Crim. Proc. Ann. art.
18.06(a), 18.07 (Vernon Supp. 2007).  Any
evidence recovered pursuant to an entry into a vehicle after the three-day
period has been illegally obtained and therefore should be excluded.  Green v. State, 799 S.W.2d 756, 759
(Tex. Crim. App. 1990). 





[9]In his attempt to show
harm, Appellant points out that Van Winkle testified that she detected a mixed
DNA profile on the outside of the glove recovered from the Mustang, and that
she could not exclude either Chelsea or Appellant as being contributors to the mixture.  We have not considered this in our harm
analysis simply because the glove was recovered in the initial search that was
conducted pursuant to Appellant=s consent. 
Therefore, we will not factor it into our analysis.  





[10]Toledano testified that
they went to Brustrom=s property to practice
shooting and to determine who had the best shot. 





[11]Jeremy testified that
Chelsea had told him to Atell the police that
[Toledano, Appellant, and herself] came to your house and all that.  We wanted you to go to Putt-Putt, but you
couldn=t come, so we came over
to your house and we stayed for a little while and then we left and I talked to
you on the phone.@ 





[12]After Rick and Suzanna
were murdered, Brustrom gave the police consent to search and drain the
pond.  One bullet was recovered from the
pond during the search.